[Cite as *Chapa v. Genpak, L.L.C.*, 2014-Ohio-897.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Tibercio Chapa, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 12AP-466 |
| v. | : | (C.P.C. No. 10CVH-11-16496) |
| Genpak, LLC et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on March 11, 2014

*Rayl L. Stepter*, for appellant.

*Littler Mendelson, P.C.*, and *Alison M. Day*, for appellees.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Plaintiff-appellant, Tibercio[1] Chapa ("appellant" or "Chapa"), appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Genpak, LLC, and Mark Ferguson ("Genpak" and "Ferguson," individually; collectively, "appellees"), on appellant's claims alleging race and national origin discrimination, negligent retention and supervision, and hostile working environment/harassment on the basis of national origin and race. Because we find the trial court did not err in determining there are no genuine issues of material fact remaining for trial and appellees are entitled to judgment as a matter of law, we affirm.

---

[1] Appellant's name was spelled incorrectly upon the filing of the initial complaint. The proper spelling of appellant's first name is Tiburcio. For purposes of consistency, we use the spelling found in the initial complaint.

## I. Facts and Procedural Background

{¶ 2} Genpak manufactures products made of various types of plastic and paper and used in the disposable food service industry. Genpak operates numerous plants, including one in Columbus, Ohio.

{¶ 3} Appellant first began working for Genpak in 2000. Appellant left Genpak in 2005, but was rehired in 2008 and has continued working there up through the filing of this appeal. Appellant is Hispanic. Appellant's parents were born in Mexico, but appellant was born in the United States and is a United States citizen. During both periods of employment with Genpak, appellant has worked as a machine operator.

{¶ 4} Ferguson began employment with Genpak in 1994 and, with the exception of a one-month period in 2006, continued to be employed there until July 2011. During appellant's initial period of employment with Genpak, Ferguson was employed as a production supervisor and sometimes supervised appellant. In 2004, Ferguson became a quality control supervisor and thereafter did not directly supervise appellant, who did not work in quality control. When appellant returned to employment with Genpak in 2008, Ferguson was employed as the quality control manager. Ferguson did not directly supervise appellant or any of the machine operators.

{¶ 5} Scott Wilson ("Wilson") is the plant manager at Genpak's Columbus plant. Wilson has held this position for more than 13 years. Wilson has averred he is the sole decision maker for hiring the production supervisors and knew that appellant was interested in the production supervisor openings that became available but determined appellant was not the most qualified applicant for the positions due to his excessive absenteeism, lack of dependability, lack of supervisory experience, and failure to attend management classes to compensate for his lack of experience.

{¶ 6} On November 10, 2010, appellant filed a complaint against Genpak and Ferguson, alleging causes of action for discrimination on the basis of race and national origin pursuant to R.C. Chapter 4112, a hostile work environment/harassment on the basis of race and national origin pursuant to R.C. Chapter 4112, retaliation,[2] and negligent supervision and retention.

---

[2]Appellant withdrew his claim for retaliation when he filed his memorandum contra appellees' motion for summary judgment on November 17, 2011.

{¶ 7} Appellant's discrimination claim is premised upon Genpak's alleged failure to promote him to the position of production supervisor on several occasions due to his race or national origin. Appellant's hostile working environment cause of action is based upon claims he was subjected to harassment by Ferguson, which included disparaging name-calling, such as "wetback," as well as Ferguson's creation of a "green card" and an "Ohio Mexican American Citizen Card" for appellant. Finally, appellant's claims for negligent retention and negligent supervision are based upon allegations that Genpak knew or should have known that Ferguson had a propensity to engage in harassment.

{¶ 8} During his first period of employment with Genpak, appellant alleges Ferguson called him various racially discriminatory and disparaging names. Ferguson was appellant's supervisor until Ferguson was promoted to quality control supervisor in 2004. For example, appellant alleges that, in 2000, Ferguson referenced a quote from a George Lopez show stating appellant was a "Mexican, not a Mexican't." Appellant admitted he did not report that comment to a supervisor or other management.

{¶ 9} During this time, appellant also asserts he applied for a promotion to production supervisor on more than one occasion, but he was never promoted. In 2000/2001, appellant purportedly applied for an open position, but Genpak hired another individual whom appellant claims was a registered sexual offender recently released from jail. Appellant asserts he was passed over again in 2002 for an individual who was younger than he and who lacked his knowledge of the equipment at the plant. After being advised that he needed a high school diploma to be a production supervisor, appellant returned to school, acquired his diploma, and graduated as the class valedictorian.

{¶ 10} Genpak's employee manual contains a no fault absentee policy setting forth an employee's obligation to be at work and to be on time. It includes a point system for missed time that constitutes an occurrence. Throughout his first period of employment, appellant received nine different warnings for attendance problems. Appellant was suspended for unexcused absences and also for failing to attend required training classes, even after receiving a prior warning for his failure to attend said classes. On June 29, 2005, after being advised that he was subject to a three-day suspension for failure to attend a mandatory make-up training class, appellant crumbled up his suspension notice,

discarded it, walked out, and voluntarily quit his employment with Genpak. Sometime thereafter, appellant moved to the state of Texas.

{¶ 11} In early 2008, appellant moved back to Ohio and contacted Ferguson about returning to work at Genpak. Appellant asked Ferguson to talk to Wilson about rehiring him as a machine operator. In April 2008, appellant began working at Genpak again as a temporary employee. He was rehired as a permanent employee for a machine operator position in June 2008. At that time, Ferguson was the quality control manager and did not supervise any of the machine operators.

{¶ 12} Upon his return to Genpak, appellant asserts he again experienced disparaging remarks based upon his race and national origin. In 2008, appellant alleges Ferguson continued to reiterate the "Mexican, not a Mexican't" remark. Additionally, Ferguson gave him two counterfeit identification cards bearing the Genpak company name and displaying appellant's name and picture. One of the cards was an "Ohio Mexican American Citizen Card" which stated it was to be carried at all times. It also bore the words "0.52 per Mexican." The second card was a "green card," which read: "This card grants access for name mentioned above to citizenship and all rights throughout the United States of America for 1.5 years." *See* Exhibit No. 1. Appellant interpreted these cards ("green cards") to mean that Ferguson did not see appellant as "equal" to him. (Chapa depo., 165.) Appellant testified he did not say anything to Ferguson about the card, but he did show it to former production manager Jerry Paulins ("Paulins"). Appellant described Paulins' reaction as one of "disbelief," but testified he did not know whether or not Paulins confronted Ferguson or did anything about the incident. (Chapa depo., 166.)

{¶ 13} Appellant also alleges he and Ferguson were eating Taco Bell in the break room along with several other employees, and Ferguson commented, "I bet this reminds [appellant] of being back at home." (Chapa depo., 153.) Appellant did not report this comment to anyone at Genpak.

{¶ 14} In 2009, appellant asserts he and Ferguson were watching a training video. The video displayed flat breads that looked like Mexican tortillas. Ferguson commented that the tortillas probably reminded appellant of being at home. Appellant did not tell Ferguson that he was offended by the comment and did not report the comment to a

supervisor or anyone in management. That same year, appellant contends plant manager Wilson also made a comment regarding appellant's race or national origin. In 2009, appellant asked Wilson if appellant's brother could apply for a job at Genpak. In his deposition, appellant testified Wilson remarked it was okay, but he should "slow down because we already met our quota," implying that there were already enough Hispanics or minorities working at Genpak. (Chapa depo., 174-75.) Appellant's brother was ultimately hired by Genpak.

{¶ 15} Tonya Siders ("Siders"), another Genpak employee, asserted that sometime between September 2009 and July 2010, she was present in the break room when Ferguson referred to appellant as a "lazy wetback" and stated that appellant would never be promoted to a supervisor's position if he (Ferguson) had anything to say about it. (Tonya Siders Affidavit, R. 68, Exhibit B.)

{¶ 16} In April 2010, appellant attended a training session with his daughter, who is light-skinned with light, almost blonde, hair. Ferguson asked appellant's daughter if she was "hanging out with Uncle JR,[3]" implying that she could not biologically be appellant's daughter. Appellant did not inform Ferguson that he found the comment to be offensive and did not complain to anyone in management. Also in 2010, Ferguson was talking about a television show known as "Gangland," which portrayed gangs of various ethnicities, including Hispanic gangs. Ferguson commented that appellant could have starred in Gangland. Paulins, a production manager, was present when the comment was made, but appellant did not report the comment to a supervisor.

{¶ 17} During his deposition, appellant was asked if there were additional instances of harassment for which he did not cite specific dates. Appellant answered yes and described these instances as "conversation starters" in which Ferguson would make some type of joke or remark whenever appellant had contact with him. Appellant testified Ferguson made remarks like "what's up burrito?" or "what's up Baby Loco?" (Chapa depo., 199.) Appellant also testified Ferguson made comments that appellant was "the only Mexican I know that doesn't eat his own food or won't eat his own food." (Chapa

---

[3] At Genpak, appellant was known as "JR" Chapa.

depo., 200.) Appellant testified these types of remarks or statements were sometimes made on a daily basis. (Chapa depo., 201.)

{¶ 18} Appellant testified at his deposition that Ferguson's comments and his use of racially derogatory terms often occurred in the presence of managers and supervisors. Appellant testified supervisors Daniel Garrett ("Garrett") and Steve Halliday ("Halliday"), as well as production manager Paulins, were sometimes present when Ferguson made these comments, but Garrett and Halliday would treat the comments as a joke and simply walk away without doing anything about them. Following one unspecified/undescribed incident, appellant testified Halliday informed appellant he (appellant) would need to contact the corporate office if he wanted to do something about the comments because he (Halliday) was not going to get involved in it. However, appellant admitted he never asked either Garrett or Halliday to do anything about the comments.

{¶ 19} Appellant testified he always told Ferguson that he did not appreciate Ferguson's remarks. (Chapa depo., 151.) Nevertheless, appellant also testified that he often simply walked away. Genpak has an anti-harassment policy set forth in its employee handbook. The policy directs any employee who has experienced or witnessed harassment to notify the plant manager. Appellant admitted he was aware of the policy and acknowledged he had attended harassment and diversity training in 2010. Appellant also acknowledged he failed to report many of these incidents to anyone at Genpak.

{¶ 20} In addition to the standard exchanges that take place between individuals who are strictly co-workers, appellant and Ferguson had additional interaction with one another. Appellant often visited Ferguson in Ferguson's office. Appellant also loaned Ferguson some DVDs of television shows he believed Ferguson would enjoy. Appellant further admitted he invited Ferguson and his family to his home to attend a birthday party for appellant's son.

{¶ 21} During his second period of employment, appellant continued to experience disciplinary issues. Appellant received several warnings for unexcused absences, as well as two separate three-day suspensions related to unexcused absences. Appellant could have been terminated for attendance problems pursuant to the attendance policy, but Genpak allowed him to retroactively use emergency vacation time in order to keep his job. Appellant also was suspended for ten days for bringing shotgun shells to work, in

violation of Genpak's zero tolerance policy on weapons and workplace violence, to exchange with another employee. Appellant acknowledged that he could have been fired as a result of this incident as well.

{¶ 22} Appellant continued to apply for production supervisor positions when openings became available during his second period of employment with Genpak. However, he was never promoted. Ferguson averred in an affidavit that he provided appellant with tips and advice on how to impress Wilson (the plant manager) in order to increase his odds of getting a promotion. Ferguson advised appellant to improve his attendance and to work extra hours when requested. Ferguson also provided appellant with pamphlets about supervisory seminars to attend at Genpak's expense.

{¶ 23} Wilson advised appellant that he needed to improve his attendance and dependability, as well as gain supervisory experience or develop his supervisory skills, in order to better qualify himself for a supervisor position. In his affidavit, Wilson testified his decision not to promote appellant was a result of appellant's lack of supervisory experience, attendance issues, and lack of dependability. Wilson further averred he did not request input from Ferguson as to whether or not appellant should be promoted to a production supervisor position and Ferguson did not volunteer an opinion.

{¶ 24} Appellant swore in an affidavit signed subsequent to his deposition that he was never advised that he was not being promoted due to attendance problems. Appellant averred many of his attendance problems were related to complications with his wife's pregnancy due to diabetes and to medical issues suffered by his daughters, which resulted in emergency room visits and emergency visits to the doctor's office. Appellant also averred that Ferguson's comments and his creation of the counterfeit "green cards" were abusive and harassing and caused him stress on the job. He further swore he believed he had to put up with Ferguson's remarks because he was worried about losing his job and needed the income and medical benefits. Appellant did not testify to this in his earlier deposition.

{¶ 25} Appellees filed a motion for summary judgment on October 17, 2011. Appellant filed his memorandum contra on November 17, 2011 and also withdrew his retaliation claim. However, on November 14, 2011, the trial court sua sponte struck appellees' motion for summary judgment on the grounds that the motion exceeded the

page limits ordered pursuant to a previous request for leave to exceed the standard 15-page limit. The trial court then granted appellees leave to file a motion for summary judgment that was in compliance with its earlier order. Appellees filed such a motion for summary judgment on December 12, 2011. Appellant's memorandum contra was re-filed on December 29, 2011. A reply was filed by appellees on January 24, 2012. The trial court granted appellees' motion for summary judgment on May 2, 2012, finding there were no genuine issues of material fact remaining and appellees were entitled to judgment as a matter of law.

## II. Assignments of Error

{¶ 26} In his timely notice of appeal, appellant asserts five assignments of error for our review:

> I. There was sufficient evidence presented to survive dismissal regarding Appellant's hostile working environment claim.
>
> II. There were genuine issues of fact as to whether a hostile working environment existed.
>
> III. There was sufficient evidence of pretext presented to survive dismissal regarding Appellant's claim of national origin and/or race discrimination.
>
> IV. There were genuine issues of material fact regarding Appellant's claim of national origin and/or race discrimination.
>
> V. The Trial Court erred in granting summary judgment regarding the Appellant's claims of negligent retention and supervision.

## III. Standard of Review

{¶ 27} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support

it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 28} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 29} In determining what constitutes a genuine issue of material fact, the court must determine whether the evidence presents " 'a sufficient disagreement to require submission to a jury,' " or whether it is " 'so one-sided that one party must prevail as a matter of law.' " *Ochsmann v. Great Am. Ins. Co.*, 10th Dist. No. 02AP-1265, 2003-Ohio-4679, ¶ 10, quoting *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

{¶ 30} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Id.*

**IV. Law and Analysis**

{¶ 31} Appellant has set forth five assignments of error in his brief. In his first assignment of error, appellant claims there was sufficient evidence presented to support

his hostile working environment claim and to defeat appellees' motion for summary judgment. In his second assignment of error, appellant submits there are genuine issues of fact as to whether or not a hostile working environment existed. Because both of these assignments of error address his claim regarding a hostile working environment, we shall address them together.

### A. First and Second Assignments of Error – Hostile Working Environment

{¶ 32} The evidentiary standards applicable in determining a violation of Title VII of the Civil Rights Act of 1964 also apply in determining whether a violation of R.C. Chapter 4112 has occurred. *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609 (1991). "Federal case law interpreting Title VII of the Civil Rights Act of 1964 * * * is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Zacchaeus v. Mt. Carmel Health*, 10th Dist. No. 01AP-683 (Feb. 5, 2002), quoting *Starner v. Guardian Industries*, 143 Ohio App.3d 461, 470 (10th Dist.2001).

{¶ 33} In order to demonstrate a claim against an employer for a hostile working environment created by racial harassment, the plaintiff must establish: (1) the employee was a member of the protected class; (2) the harassment of the employee was unwelcome; (3) the harassment complained of was based on race; (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment; and (5) respondeat superior (employer) liability. *Zacchaeus*; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). We focus our analysis on the fourth and fifth elements of the test, as the first, second, and third elements are undisputed by the parties.

#### 1. The Fourth Element

{¶ 34} In looking at the fourth element of the test for a hostile working environment claim, the court must determine whether the working environment was sufficiently hostile, which requires the court to look at all of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance. *Zacchaeus*, citing *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998); *Harris* at 21-22. Determining

whether an environment is sufficiently hostile or abusive requires consideration of all the circumstances, not any one factor. *Cerett v. Timken Co.*, 5th Dist. No. 2006CA0056, 2006-Ohio-5892, ¶ 24; *Harris* at 23.

{¶ 35} The standards for judging hostility are sufficiently demanding in order to ensure that Title VII does not become a "general civility code." *Faragher* at 788, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). If properly applied, these standards will filter out complaints which attack " 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.' " *Id.* at 788, quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). Conduct must be extreme to constitute a change in the terms and conditions of employment. *Id. See also Harter v. Chillicothe Long-Term Care, Inc.*, 4th Dist. No. 11CA3277, 2012-Ohio-2464, ¶ 19. In order to constitute actionable abusive work environment harassment under Title VII, the conduct is not required to seriously affect an employee's psychological well-being or lead the employee to suffer injury. *Cerett* at ¶ 24, citing *Harris* at 114.

### a. Frequency

{¶ 36} First, appellant argues the trial court's determination that the statements uttered by Ferguson were made "frequently" should have led to the conclusion that a jury must determine whether or not a hostile working environment existed, as the existence of frequent harassment alone is sufficient to find a hostile working environment. We disagree.

{¶ 37} In order to determine whether an environment is sufficiently hostile or abusive, courts must look at all of the circumstances, which includes the frequency of the discriminatory conduct, as well as the severity of the conduct, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Thus, as stated above, frequency is but one factor for consideration.

{¶ 38} Admittedly, pursuant to appellant's assertions, by which he contends he was subjected to routine name-calling, the conduct was indeed somewhat frequent, although we note that the conduct spans a combined period of eight years. In addition, Ferguson was not appellant's supervisor during his second term of employment from 2008 to 2010,

and the record indicates that appellant and Ferguson were working different shifts at times during that period.

{¶ 39} Nevertheless, appellant cites to the following specific incidents: (1) the 2000 incident involving the quote from the George Lopez show where Ferguson described appellant as a "Mexican, not a Mexican't"; (2) the 2008 incident when Ferguson continued to reiterate the "Mexican, not a Mexican't" remark; (3) the 2008 incident involving the "green cards"; (3) the 2008 incident when appellant was eating Taco Bell and Ferguson commented that it probably reminded appellant of being back home; (4) the 2009 incident involving the training videos displaying flat breads when Ferguson commented those probably reminded appellant of being at home; (5) the 2009 or 2010 incident in which Ferguson referred to appellant as a "lazy wetback" in the presence of Siders and stated appellant would never be promoted if Ferguson had anything to do with it; (6) the 2010 incident in which Ferguson referred to appellant as "Uncle JR" in the presence of appellant's daughter, implying she was not biologically his daughter; and (7) the 2010 incident where Ferguson was discussing the television show "Gangland" and remarked that appellant could have starred in the show.

{¶ 40} Without citing specific dates or years, appellant further submits he was sometimes subjected to racial remarks or statements from Ferguson on a daily basis. This name-calling included remarks such as "what's up burrito?" or "what's up Baby Loco?" (Chapa depo., 199.) Ferguson used the "Mexican, not a Mexican't" phrase too. Appellant described these routine instances as "conversation starters" in which Ferguson would make some type of joke or remark whenever appellant had contact with him. Appellant testified Ferguson also made comments that appellant was "the only Mexican I know that doesn't eat his own food or won't eat his own food." (Chapa depo., 200.)

{¶ 41} While we agree that the comments were made on a somewhat frequent basis, we do not agree that this, by itself, constitutes a hostile working environment, as additional factors must be considered, along with the environment as a whole. *See McGraw v. Pilot Travel Ctrs., L.L.C.*, 10th Dist. No. 11AP-699, 2012-Ohio-1076, ¶ 27-28 (whether an environment is hostile must be determined by looking at all of the circumstances; hostile working environment claim failed where the plaintiff did not present evidence that reference to the plaintiff as "Baby," "Hun," or "Sweetie" was

sufficiently severe or humiliating so as to cause psychological harm or unreasonably interfere with the plaintiff's job performance).

### b. Severity

{¶ 42} Appellant also disputes the trial court's determination that the harassment was not severe, claiming the use of the term "wetback" on a single occasion has been found to be sufficient to constitute a hostile working environment. Appellant relies upon *E.E.O.C. v. Ceisel Masonry, Inc.*, 594 F. Supp. 2d 1018, 1023 (N.D.Ill.2009) for support.

{¶ 43} In assessing whether the conduct complained of is sufficiently severe or pervasive, the court " 'must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the effect of all episodes of * * * abusive treatment.' " *Tod v. Cincinnati State Technical and Community College*, 10th Dist. No. 10AP-656, 2011-Ohio-2743, ¶ 52, quoting *Hampel v. Food Ingredients Specialties*, 89 Ohio St.3d 169, 181 (2000), paragraph five of the syllabus. The "totality of the circumstances" standard "precludes the kinds of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits. Instead, it is essential that the work environment be viewed as a whole, 'keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.' " *Id.* at ¶ 53, quoting *Hampel* at 181.

{¶ 44} "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Hampel* at 181, quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991). " '[G]reater severity in the impact of harassing behavior requires a lesser degree of pervasiveness in order to reach a level at which Title VII liability attaches.' " *Hampel* at 181, quoting *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1524 (M.D.Fla.1991).

{¶ 45} In reviewing *Ceisel Masonry*, which we note is not controlling authority, we find it does not stand for the proposition asserted by appellant. In that case, the court discussed a case involving the term "wetback," and acknowledged it is " 'difficult to imagine epithets more offensive to someone of Hispanic descent.' " *Ceisel Masonry* at 1023, quoting *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950-51 (7th Cir.2005). However, the court found that isolated utterances of racial epithets do not create a hostile

working environment. *Id.*, citing *Salvadori v. Franklin School Dist.*, 293 F.3d 989, 997 (7th Cir.2002). But, the court did find that a *series* of such statements could result in a hostile work environment. *Id.* at 1023. *See also Cerros* at 951 ("[A] sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute."). Futhermore, the court recognized that "second-hand harassment" (where the comments are not directed at the listener) is not as severe. *Ceisel Masonry* at 1023, citing *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 567 (7th Cir.2004). *See also Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997) (comments need not be directed at the plaintiff to constitute conduct violating Title VII of the Civil Rights Act, but this fact contributes to the conclusion that the conduct was not severe enough).

{¶ 46} In analyzing the severity of the conduct in the case before us, we look to *Smith v. Glenny Glass Co.*, S.D. Ohio No. 1:06cv638 (Apr. 20, 2007), for instruction. In *Glenny Glass*, an African-American plaintiff asserted a claim for a racially hostile work environment based upon seven incidents of conduct which included comments such as frequently comparing the plaintiff's manner of walking to "picking cotton," advising a customer not to touch a piece of glass containing a wet black glue because the plaintiff was "white when he started," and a co-worker's comparison of plaintiff to a black photograph that did not develop properly. The Sixth Circuit noted that while there was no controlling case law on how to determine "severity," common sense would dictate that the comments were "base [sic], insensitive, and inappropriate." However, they could not reasonably be perceived as "severe" and were not physically threatening. *See also Zacchaeus* (infrequent comments made on three occasions over a one-week time frame, such as "black South Africans are monkeys," while offensive utterances did not rise to the level of severity necessary for an actionable hostile work environment claim).

{¶ 47} Here, appellant's deposition testimony and the affidavit of Siders supports a finding that Ferguson called appellant a "wetback" on one occasion in the presence of Siders but when appellant was not present. Counsel for appellant seems to argue that appellant was called a "wetback" on a daily basis. Yet, we struggle to interpret appellant's deposition testimony as indicating that the term "wetback" was used on a daily basis. This struggle is made more complicated by the fact that appellant frequently failed to cite to

the places in the record which support his position or to support his factual assertions using evidence in the record. *See* App.R. 16(A)(6) and (7).

**{¶ 48}** Instead, our reading of the transcript indicates that the use of the term "wetback" occurred on a single occasion rather than on a daily basis, but that *other* terms, like "burrito" and "Baby Loco," *were* used on a regular basis, and that the term "wetback" was used once outside appellant's presence and relayed to him by Siders. Appellees appear to interpret the testimony in this fashion as well. Admittedly however, given the rather vague nature of the questioning on re-direct, it is *possible* that appellant's testimony could be interpreted to mean that the term "wetback" was one of the terms used on a routine basis, although we believe it unlikely. (Chapa depo., 166-71; 199-201.)

**{¶ 49}** Nevertheless, appellant's testimony also indicated that he and Ferguson "sometimes" worked the same shift, such as when Ferguson was filling in for another supervisor. (Chapa depo., 201.) This tends to make the conduct less pervasive. Given the number and context of the specific comments referenced by appellant and the general assertions made with respect to the "routine" name-calling, and given the testimony indicating that Ferguson and appellant only "sometimes" worked the same shift, it is difficult to characterize the conduct as pervasive or severe, based upon our analysis of other cases asserting a claim for hostile working environment based on race, as shall be set forth in more detail below.

### c. Physically Threatening or Humiliating

**{¶ 50}** Appellant also argues the trial court erred in determining Ferguson's conduct was not physically threatening or humiliating, citing to use of the phrase "wetback" on a daily basis and the making of the "green cards" which purportedly questioned appellant's citizenship and his value as a human being. Appellant contends these acts were humiliating and offensive.

**{¶ 51}** First, we note again that we disagree with appellant's characterization that he was called a "wetback" on a daily basis. As stated above, we do not believe the record supports this assertion. Also, the "wetback" comment that is supported by the record was not made in appellant's presence, but instead was made to a co-employee. Second, with respect to Ferguson's act of presenting the "green cards" to appellant, it is significant to point out that this is one of the only incidents that appellant actually complained about to

a supervisor. Following his complaint, the "green card" issue was never raised again, although appellant testified he did not know if Ferguson was ever confronted by Genpak about the cards. Admittedly, appellant did testify and aver in his affidavit that he interpreted the "green cards" as meaning he was not equal to Ferguson. He further averred this was "like a slap in the face." (Chappa Affidavit, ¶ 3, R. 67, Exhibit A.) However, *see Bourini v. Bridgestone/Firestone N. Am. Tire, L.L.C.*, 136 F.Appx. 747 (6th Cir.2005) (comments such as referring to a Muslim co-worker as a "camel jockey" and telling the co-worker that he might be able to hear better if he got the sand out of his ears did not rise to the "humiliating" level of severe conduct required to create an objectively hostile work environment). Finally, none of the comments or actions alleged by appellant could be interpreted as physically threatening. As a result, we do not believe the conduct at issue rises to the level of being physically threatening or sufficiently humiliating to constitute conduct creating an objectively hostile work environment.

### d. Interference with Work Performance

{¶ 52} In addition, appellant argues the trial court improperly found interference with work performance was the determining factor in its analysis of appellant's hostile work environment claim, rather than analyzing such interference as but one factor in the analysis. Appellant further asserts the test can be met even if job performance is not tangibly affected. Appellant claims the totality of the circumstances here constitute evidence of an adverse affect on the terms and conditions of appellant's employment. Appellant submits the trial court should have determined whether or not the terms and conditions of employment were affected by Ferguson's offensive conduct and comments.

{¶ 53} We disagree with appellant's assertion that the trial court found interference with work performance to be the determining factor in its analysis of this claim. Rather, the trial court's decision reflects that it considered all of the relevant factors in making its determination. In reviewing the trial court's decision, we find it conducted an in-depth analysis of all of the circumstances to be considered in determining if the conduct at issue had the effect of unreasonably interfering with appellant's work performance or of creating an intimidating, hostile, or offensive work environment.

{¶ 54} A hostile work environment exists where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' * * * that is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]' " *Harris*, 510 U.S. 17, at 21, quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986).

{¶ 55} " '[M]ere utterance of an . . . epithet which engenders offensive feelings in a employee,' does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21-22, quoting *Meritor Savings* at 67.

### e. Severe or Pervasive – a Comparison with Other Cases

{¶ 56} In analyzing whether the trial court reached the appropriate result, we conduct a comparison of this case to other cases asserting a claim for hostile working environment based on race.

{¶ 57} In *Glenny Glass*, the plaintiff alleged he was subjected to seven instances of disparaging remarks made by Glenny Glass employees or its president over a five-year period. In addition to the three instances cited above in our analysis of the severity factor, the following additional instances occurred: (1) while lifting a piece of graylite glass 14 (the darkest commercial glass available), the president said, "you can lift that glass because it's black like you. Is that what happened to your wife?"; (2) the president made reference to his grandparents having a black butler who made moonshine in the bathtub; (3) in response to a suggestion by a co-worker that they invite the plaintiff to join them on vacation, the president said "why [does plaintiff] need to go to Florida? He's tanned enough"; and (4) the employer received a fax on "Ebonics" which the president read aloud as he laughed, and plaintiff was offended by many of the statements.

{¶ 58} Specifically, the court in *Glenny Glass* found the frequency of the comments was sporadic, rather than routine, and therefore the frequency factor did not weigh in the plaintiff's favor. As to the severity of the alleged comments, the court noted the comments were not alleged to have been made with hostility, aggression, or violence. It noted the comments could not reasonably be perceived as "severe" and none of the comments were

physically threatening. Furthermore, the court determined that, taken as a whole, the comments did not rise to the level of pervasive or severe and, based upon precedent, did not form the basis of an actionable claim for a hostile work environment. Consequently, the court granted the defendants' motion for summary judgment.

{¶ 59} In looking at the seven instances of conduct and reaching its determination, the court in *Glenny Glass* considered various other Sixth Circuit cases as a benchmark. *See Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999) (employee was entitled to have her hostile work environment claim decided by a jury when her co-workers used racial epithets against her, she was the target of false accusations regarding her work performance, and she was subjected to routine and pervasive racial slurs and graffiti generally directed towards African-Americans); *Allen v. Mich. Dept. of Corr.*, 165 F.3d 405, 408-09 (6th Cir.1999) (an objectively racially hostile work environment existed where the employee alleged being skipped over for promotions, received unwarranted disciplinary counseling notices, was told by a manager he was "lazy like the rest of his people and that is why they are all in prison," received a death threat signed KKK which included a picture of a stick figure with a noose around its neck, and was transferred to an area in order to be monitored carefully because "niggers can't be trusted"); *Moore v. Kuka Welding Sys.*, 171 F.3d 1073 (6th Cir.1999) (employee was entitled to present his racially hostile work environment claim to a jury when he was subject to numerous and frequent racial slurs and jokes, including "hey nigger," and the supervisor did not address it; someone wrote "kill all niggers" on the bathroom wall and no action was taken; he was asked by a supervisor to drive a fellow white employee who was seated in the backseat; and he was subjected to more than one year of supervisor-mandated daily isolation after he filed a complaint with the Equal Employment Opportunity Commission); and *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006) (hostile work environment claim supported where city firefighter alleged a plethora of racially offensive jokes and graffiti, derogatory comments, isolation, segregation, malicious pranks, disparate treatment, additional duties, and racially motivated transfers during a 15-year period of employment).

{¶ 60} We also find the *Bourini* case to be instructive. In that case, a Muslim employee alleged nine incidents of national origin and religious harassment: (1) a co-

worker proclaimed, "I don't want to ... see your camel tied to my wheels"; (2) a co-worker referred to him as a "camel jockey"; (3) following the September 11 attacks, a co-worker attempted to back over him with a forklift; (4) a co-worker said, "If it were up to [me], they would...put [plaintiff] in a box and send [him] back to [his] country"; (5) a co-worker told him, "If you'd get the sand out of your ears you'll hear me better"; (6) a co-worker imitated plaintiff's voice over the intercom system; (7) someone wrote Islamic slurs on the restroom wall; (8) someone dropped off a Christian pamphlet at the plaintiff's work station entitled, "For my Muslim Friend"; and (9) human resources sent an e-mail relating to the plaintiff's immigration status to fellow employees. Upon review, the court concluded the incidents, "were not sufficiently pervasive to establish an abusive working environment." *Id.* at 751. Because the incidents occurred over a period of five years, the court determined they were "relatively infrequent and isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of employment." *Id.*

{¶ 61} Furthermore, our own court has analyzed a hostile working environment claim in the context of racial harassment and determined the plaintiff failed to demonstrate that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's work environment. In *Zacchaeus*, the plaintiff worked for his employer, Mount Carmel, for less than two months. He testified that while working with the harassing co-employee, "every night something is happen[ing]" and the conduct was continuous. *Id.* The plaintiff alleged the co-employee made comments such as "black South Africans are monkeys," "all blacks are on Welfare and on drugs," and that she did not like blacks. *Id.* After his firing, the plaintiff also worked for Mount Carmel through a temporary agency and claimed a second co-employee made a comment to the effect that "why is black children eating chocolate, and isn't that why their face is too black." *Id.*

{¶ 62} On appeal, Zacchaeus challenged the trial court's decision granting the defendants' motion for summary judgment on the claim for racial harassment. Upon review, we determined the evidence was insufficient to sustain the claim, finding the evidence presented did not meet the standard for conduct that was sufficiently severe or pervasive to alter the conditions of the plaintiff's work environment. We found the comments, which were made on only three occasions over a one-week timespan, were

"infrequent." We further noted the comments were not physically threatening or sufficiently humiliating to create a hostile working environment and did not rise to the severity level necessary for an actionable claim.

### f. Subjective belief

{¶ 63} Finally, appellant argues the trial court erred in finding insufficient evidence to support a subjective belief that a hostile work environment existed. Appellant cites to testimony and evidence indicating that Ferguson: (1) called appellant a "wetback"; (2) stated he would interfere in appellant's efforts to obtain a promotion; and (3) created the "green cards." Appellant also testified he needed the job at Genpak to support his family and he attempted to work a different shift in order to limit contact with Ferguson. Appellant asserts the trial court considered other factors, such as the fact that appellant returned to work for Genpak after previously resigning and that relatives of appellant also came to work for Genpak, and improperly weighed the testimony and determined the credibility of appellant. Appellant submits that genuine issues of material fact remain as to his subjective belief that a hostile working environment existed. We conclude the trial court did not err in finding insufficient evidence to support a subjective belief that a hostile work environment existed.

{¶ 64} To be an actionable hostile working environment claim, the conduct at issue must be severe or pervasive enough to create: (1) an objectively hostile or abusive work environment, such that a reasonable person would find it to be hostile or abusive, and (2) a subjectively hostile work environment, such that the victim himself perceived the environment to be hostile or abusive. *Tod* at ¶ 52, citing *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 723 (10th Dist.1999). "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim." *Long v. Ford Motor Co.*, 193 Fed.Appx. 497, 501 (6th Cir.2006), citing *Harris* at 21-22.

{¶ 65} Based upon a comparison of this case to other cases involving a hostile working environment based on race, we cannot find that the conduct is so severe or pervasive as to constitute a hostile or abusive working environment to a reasonable person. Furthermore, based on the evidence presented, we cannot find that appellant

perceived the environment to be hostile or abusive. One additional factor which impacts our decision is evidence that a personal relationship existed between appellant and Ferguson.

{¶ 66} Appellant argues the trial court improperly weighed the evidence and determined the credibility of the witnesses on this issue, given that Ferguson declared the working environment was not hostile, while appellant maintained that it was. Yet, we do not believe that is what the court did. Given the factual circumstances, which appellant does not dispute, we believe reasonable minds could come to but one conclusion on this issue, and that conclusion is adverse to appellant. We further believe it is "so one-sided that one party must prevail as a matter of law." *Ochsmann* at ¶ 10.

{¶ 67} Appellant has not denied that he recommended that four of his siblings apply for jobs at Genpak. Those four sibilings applied and were subsequently hired. Appellant acknowledged that, after leaving Genpak of his own accord in 2005 and living out of state for approximately three years, he personally contacted Ferguson in 2008 to inquire about returning to work for Genpak. Even though Ferguson was no longer appellant's supervisor when appellant returned to Genpak in 2008, appellant has not denied that he frequently hung out in Ferguson's office and talked with him and also loaned Ferguson DVDs of television shows he thought Ferguson would enjoy. Furthermore, appellant acknowledged he invited Ferguson to his home for a cookout for his son's birthday.

{¶ 68} Based upon the foregoing analysis and our comparison of this case to other cases asserting a claim for hostile working environment based upon race, we conclude the trial court reached the appropriate result with respect to the question of whether the conduct was severe or pervasive. Although the question of whether conduct is severe or pervasive is "quintessentially a question of fact," other courts, such as the Sixth Circuit, have nevertheless affirmed grants of summary judgment and in a number of cases determined the alleged conduct was not sufficiently severe or pervasive as a matter of law. *See Chancellor v. Coca-Cola Ents., Inc.*, 675 F.Supp.2d 771 (S.D.Ohio 2009). In addition, although appellant claims he believed the environment to be hostile but put up with it because he needed the job, his conduct indicates otherwise, and no reasonable juror could reach the conclusion that appellant subjectively believed he was being harassed by

Ferguson on the basis of race or national origin. Finally, Ferguson's conduct did not create an objectively hostile work environment.

{¶ 69} In conclusion, we find appellant cannot establish his hostile working environment claim because he has failed to meet the fourth element of the test by demonstrating that the alleged conduct was so severe or pervasive as to create an environment that was hostile pursuant to both a subjective and objective analysis.

### 2. The Fifth Element

{¶ 70} In order to establish a claim for a hostile work environment, appellant is also required to demonstrate employer liability. Upon review, we find appellant cannot establish a basis for employer liability, and thus appellant cannot meet the fifth element of the test.

{¶ 71} The requirements for demonstrating employer liability differ, depending on whether the alleged harasser is a supervisor or a co-worker. In *Brentlinger v. Highlights for Children*, 142 Ohio App.3d 25, 33 (10th Dist.2001), we found:

> Employer liability for hostile work environment harassment varies depending upon whether the alleged harasser is a supervisor or a co-worker. When the alleged harasser is a supervisor, the employer may be vicariously liable. *Burlington* [*Industries, Inc. v. Ellerth*], 524 U.S. at 763-765 [1998] * * *. Under this scenario, when harassment by a supervisor with authority over the employee culminates in a tangible employment action against the plaintiff, the employer is subject to vicarious liability and the analysis ends. *Id.* at 763-765 * * *. Where no tangible employment action was taken, but a hostile work environment was created, the employer may avail itself of an affirmative defense to liability. To successfully raise this affirmative defense, an employer must establish two elements by a preponderance of the evidence: first, that the employer exercised reasonable care to prevent and correct properly any * * * harassing behavior, and second, that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

{¶ 72} We further determined that when the alleged harasser is a co-worker, rather than a supervisor, the employer may be liable to the plaintiff based on its own negligence. *Id.* In that circumstance, an employer may be liable for a co-worker's harassment of an employee when the employer knew or should have known of the charged harassment and

failed to implement prompt and appropriate action. *Id.*, citing *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872-73 (6th Cir.1997). *See also Glenny Glass*, fn. 6, quoting *Jackson* at 659, quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988) (employer is vicariously liable for harassment committed by supervisors but liable for co-worker harassment only where it " ' "tolerated or condoned the situation" ' " or " ' "knew or should have known of the alleged conduct and failed to take prompt remedial action." ' ").

{¶ 73} Recently, in *McGraw*, we reiterated this concept and emphasized that in order to establish a hostile-environment harassment claim, the plaintiff was required to show either that (1) the harassment was committed by a supervisor, or (2) the employer, through its agents or supervisors, knew or should have known of the harassment and failed to take appropriate and immediate corrective action. *McGraw* at ¶ 21, citing *Hampel* at 176. We relied upon Sixth Circuit precedent to define "supervisor" as "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.' " *McGraw* at ¶ 22, quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.2004). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate or successively higher authority over the employee. *McGraw* at ¶ 22, citing *Faragher* at 807-08.

{¶ 74} The question here is whether Ferguson should be considered a supervisor or a co-worker in the context of our employer liability analysis. In *McGraw*, we determined that, although the defendant was a manager, he was not the plaintiff's named supervisor and he did not hire and could not fire the plaintiff, although he could direct the plaintiff on what to do when she was occasionally helping and assisting others with their job tasks. We determined this did not constitute significant control over the conditions of the plaintiff's employment, and although the defendant was on a higher level of authority than the plaintiff, the defendant did not have direct control over the plaintiff and only had indirect control in limited circumstances. Consequently, we determined the defendant was not appellant's supervisor and the alleged harassment must be analyzed under the co-worker harassment standard. We further defined that standard to be one where "the company may be held liable for co-worker harassment if its response manifests

indifference or unreasonableness in light of the facts the employer knew or should have known." *McGraw* at ¶ 24.

{¶ 75} The circumstances in the case before us are similar to those in *McGraw* in that Ferguson was not appellant's supervisor at the time of these alleged incidents and there is no evidence that he had the power to fire appellant or that he could significantly change appellant's conditions of employment. While Ferguson was a supervisor, he was not appellant's designated supervisor. Therefore, we analyze the issue of employer liability under a co-worker liability standard.

{¶ 76} A company may be liable for co-worker harassment "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* at ¶ 25. A response is typically considered adequate if it is reasonably calculated to stop the harassment. *Id.* The effectiveness of the response is measured by whether the steps taken by the employer end the harassment. *Id.*

{¶ 77} In his deposition testimony, appellant acknowledged that he did not report many of the incidents that occurred involving Ferguson. However, appellant argues that managers and supervisors were present during some of the harassment incidents, and, therefore, Genpak knew or should have known about the harassment.

{¶ 78} Appellant testified that he reported the incident involving the "green cards" to Paulins, and that Paulins' reaction was one of "disbelief." Appellant further testified he did not know whether or not Paulins confronted Ferguson or did anything about the incident. However, the "green cards" incident was not repeated and no further discussion regarding the cards occurred.

{¶ 79} Appellant also argues that supervisor Paulins was present for the incident involving the "Gangland" comment, and, therefore, Paulins knew or should have known of the harassment and failed to take appropriate corrective action. Even assuming Paulins was present and heard the comment, we have neither an affidavit nor deposition testimony from Paulins, and there is nothing in the record that would indicate Paulins had ever seen the show "Gangland" or knew that a comment such as that could be interpreted as racial harassment. As appellees argue, Paulins' presence during the utterance of a comment made about a television show that may not have had widespread popularity does not demonstrate that a supervisor was aware of the alleged harassment.

{¶ 80} In addition, appellant argues that another supervisor, Halliday, was aware of Ferguson making harassing remarks, but informed appellant he was not going to get involved. However, we find that appellant's deposition transcript does not support this claim.

{¶ 81} Appellant testified at his deposition that supervisors Garrett and Halliday were sometimes present when Ferguson made comments involving his race and/or national origin. However, appellant did not provide any details or cite to specific incidents when this occurred, other than simply his general comment that these two supervisors were sometimes present. Appellant did testify to a time when Halliday told appellant that, if appellant wanted to do something about the comments made by Ferguson, he (appellant) would have to contact the corporate office himself because Halliday was not going to do it. Yet, appellant did not provide any details about the comments that were made at that time. In fact, a review of appellant's deposition transcript reveals the following exchange:

> Q. You didn't say anything to [Garrett] or [Halliday] about it, did you?
>
> * * *
>
> A. Well, to [Halliday] I did. I didn't like how he used to, you know, talk about me and stuff, because with [Halliday] I actually –[Halliday] was the person who gave me – well, *he didn't like the way [Ferguson] used to talk about people because he didn't feel that that was right, the way he would – you know, his remarks and stuff towards not just me, but other fellow employees.*
>
> * * *
>
> A. And [Halliday] actually said that that's something you'd have to deal with corporate more than likely.
>
> Q. Did you ask [Halliday] to do anything about it?
>
> A. Well, he said he wasn't getting involved in that.

(Emphasis added.) (Chapa depo., at 203-04.)

{¶ 82} This is not sufficient to establish that the "comments" were actually racially disparaging or based upon national origin. It simply establishes that Halliday seemed to dislike the way Ferguson talked about people and disliked the remarks that Ferguson made. It does not establish the existence of racial harassment. Furthermore, appellant admitted that he never asked Garrett or Halliday to do anything about the comments or to take any action against Ferguson. Thus, even if there were supervisors who were aware that Ferguson had made some comments to appellant, the specifics of those comments are unknown. Moreover, even if these supervisors were aware of these non-descript comments, there is no evidence that appellant asked the supervisors to take action against Ferguson or that an official complaint was lodged which would alert Genpak to the specific problem. "Absent knowledge of the conduct, Defendants cannot be liable for coworker harassment." *Sweezer v. Michigan Dept. of Corr.*, 6th Cir. No. 99-1644 (Aug. 11, 2000).

{¶ 83} The single incident with the "green cards" and the vague comment regarding the "Gangland" television show do not demonstrate that Genpak knew or should have known that appellant was allegedly subjected to harassment. It cannot be said that Genpak's response manifested indifference or unreasonableness in light of the facts that it knew or should have known. Therefore, we find appellant cannot meet the fifth element of the hostile work environment test.

{¶ 84} Because appellant cannot meet either the fourth or the fifth element of the hostile work environment racial harassment test, we overrule his first and second assignments of error.

### Third and Fourth Assignments of Error – Race and National Origin Discrimination

{¶ 85} In his third assignment of error, appellant claims he presented sufficient evidence of pretext regarding his claim for race and national origin discrimination, and therefore summary judgment in favor of appellees was improper. In his fourth assignment of error, appellant submits there are genuine issues of material fact remaining as to his race and national origin discrimination claim, and therefore it was improper to grant summary judgment to appellees. Because both of these assignments of error

address his cause of action for race and national origin discrimination, we shall address them together.

### 1. Direct Evidence of Discrimination

{¶ 86} In presenting these two assignments of error, appellant contends there is direct evidence of discrimination involving his promotion denials on the basis of race and/or national origin. Appellant cites to evidence that Ferguson called him a "wetback" and commented that appellant would not be promoted to a supervisor position if Ferguson had anything to do with it. Appellant also contends Ferguson had input into the selection of supervisors. Appellant asserts these comments from Ferguson constitute direct evidence sufficient to prove appellees possessed racial animus prompting them to fail to promote him. Appellant argues that when a supervisor with unlawful discriminatory intent takes action to cause an adverse employment action, such as a promotion denial, the employer can be liable for discrimination, even if that supervisor was not the final decision-maker.

{¶ 87} In order to prevail in a case alleging claims of racial discrimination under R.C. 4112.02(A), the plaintiff must prove discriminatory intent, which may be established with either direct or indirect methods of proof. *Morrissette v. DFS Servs., LLC*, 10th Dist. No. 10AP-633, 2011-Ohio-2369, ¶ 12, citing *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), *discretionary appeal dismissed*, 88 Ohio St.3d 1229 (2000); *Veal v. Upreach, LLC*, 10th Dist. No. 11AP-192, 2011-Ohio-5406, ¶ 20, 27.

{¶ 88} While Ohio courts are not required to apply a federal court interpretation of federal statutes to analogous Ohio statutes, this court has previously looked to federal case law in considering claims of employment discrimination filed pursuant to the Ohio Revised Code. *See Morrissette* at ¶ 17, citing *Coryell v. Bank One Trust Co., N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, ¶ 15.

{¶ 89} Using the direct evidence standard set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the plaintiff has to produce direct evidence that an illegitimate criterion, such as race, played a motivating part in the decision. *Carter v. Russo Realtors*, 10th Dist. No. 00AP-797 (May 22, 2001). Direct evidence is " 'proof which speaks directly to the issue, requiring no support by other evidence.' " *Id.*, quoting *Randle v. LaSalle Telecommunications, Inc.*, 697 F.Supp. 1474, 1478 (N.D.Ill.1988). Such

evidence " 'directly proves a fact without an inference or presumption; and which, if true, conclusively establishes that fact.' " *Id.*, quoting *Randle* at 1478. Once the plaintiff establishes this direct evidence, the burden then shifts to the defendant, who must demonstrate, by a preponderance of the evidence, that the same decision would have been reached absent any discrimination. *Id.* If the defendant does not meet this standard, the plaintiff prevails. *Id.*, citing *Randle.* The plaintiff has the ultimate burden of persuasion to prove that race motivated the defendant's decision. *Id.*

{¶ 90} Discriminatory statements only support a claim for discrimination under the direct evidence standard if there is a causal link or nexus between the discriminatory statement and the prohibited act of discrimination. *Id.* Vague, ambiguous, or isolated comments cannot be used as direct evidence to establish that an adverse action was motivated by discriminatory intent. *Id.*, citing *Tessmer v. Nationwide Life Ins. Co.*, 10th Dist. No. 98AP-1278 (Sept. 30, 1999). Furthermore, "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" are excluded as direct evidence of discrimination. *Id.*

{¶ 91} " 'To rise above the level of a stray remark and constitute direct evidence of discrimination, a remark must:  (1) be made by the decision maker or one whose recommendation is sought by the decision maker; (2) be related to the specific * * * decision challenged; and (3) be made close in time to the decision.' " *Id.*, quoting *Ross v. Communication Workers of Am., Local 1110*, S.D.N.Y. No. 91 Civ. 6367 (June 9, 1995). *See also Swiggum v. Ameritech Corp.*, 10th Dist. No. 98AP-1040 (Sept. 30, 1999) (comments by co-worker that cannot be linked to the decision maker bringing the adverse action do not substantiate a finding of employment discrimination; there is a difference between comments demonstrating a discriminatory animus in the decision-making process and stray remarks made by non-decision makers; statements were also remote in time with respect to plaintiff's termination).

{¶ 92} In the instant case, we have established that Ferguson was not appellant's supervisor during the second time period that he worked at Genpak, which began in 2008. Based upon the affidavit of Wilson, Wilson was the sole decision maker in determining who was hired for production supervisor positions. Wilson averred he did not ask Ferguson for any input on whether appellant should be promoted and Ferguson

did not volunteer any input on the subject. Wilson also averred he did not consider any opinion that Ferguson may have had to be relevant. Appellant does not have any evidence to refute this. More importantly, the alleged comments upon which appellant relies were made sometime during Siders' period of employment at Genpak, which ran between September 23, 2009 and July 2010. Ferguson was not appellant's supervisor during this time period. In order to use the comments at issue as direct evidence in his discrimination case, Ferguson would have to the decision maker in deciding whether or not appellant was promoted or his recommendation would need to be sought by the decision maker, neither of which occurred here. In addition, the comments were not made close in time with respect to the 2000/2001 and 2002 promotion denials.[4] Thus, these comments cannot be used as direct evidence.

### 2. Indirect Evidence of Discrimination

{¶ 93} Appellant also argues there is indirect evidence of race and/or national origin discrimination.

{¶ 94} When seeking to establish disparate-treatment discrimination based on race by indirect proof, the plaintiff may establish discriminatory intent using the analysis in *McDonnell Douglas*, as adopted by the Supreme Court of Ohio in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146 (1983), and recently modified in *Coryell*. *Morrissette* at ¶ 12; *Veal* at ¶ 20.

{¶ 95} Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.* at ¶ 21. In the context of a claim for failure to promote, the plaintiff's prima facie case must present evidence showing: (1) he is a member of a protected class; (2) he was qualified for the promotion in question; (3) he was considered for and denied the promotion; and (4) other individuals of similar qualification who were not part of the protected class received the promotion. *Veal* at ¶ 27; *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584-85 (6th Cir.2009); *Grizzell v. Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir.2006). *See also Hicks v. SSP Am., Inc.*, 490 Fed.Appx. 781, 783 (6th Cir.2012) and *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir.2005).

---

[4] The 2000/2001 and 2002 promotion denials are also time-barred, as shall be discussed in our analysis of appellant's claims asserting there is indirect evidence of racial discrimination.

{¶ 96} Once the plaintiff has established a prima facie case, the burden shifts to the employer to present evidence of a legitimate, nondiscriminatory reason for its action. *Veal* at ¶ 21, citing *McDonnell Douglas* at 802. If the employer meets this burden, then the plaintiff must demonstrate that the reason offered by the employer was not its true reason, but rather a pretext for discrimination. *Veal* at ¶ 21, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

{¶ 97} According to appellant's brief, he is only contesting two promotion denials: (1) the 2000/2001 promotion denial in which Richard Hill, without experience running Genpak's equipment, received the promotion; and (2) the 2002 promotion denial in which Brent Gothard, whom appellant believes was younger than he and purportedly not knowledgeable about Genpak's equipment, received the promotion. However, appellant argues the promotion denials were ongoing through January 2011. Despite the fact that these promotion denials occurred more than six years prior to the filing of appellant's complaint, appellant argues these claims can be pursued under the "continuing violation" doctrine.

{¶ 98} "An action upon * * * a liability created by statute other than a forfeiture or penalty * * * shall be brought within six years after the cause thereof accrued." *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.*, 70 Ohio St.3d 281, 282 (1994). Therefore, any action surrounding the 2000/2001 and 2002 promotion denials is time barred, unless the "continuing violation" doctrine is applicable and tolls the statute of limitations period. We find the doctrine is not applicable here.

{¶ 99} Under the "continuing violation" theory, which is recognized in Ohio Adm.Code 4112-3-01(D)(2), "[i]n cases of recurring or continuing violations, the filing period begins to run anew with each new discriminatory act or with each new day of the continuing violation." "The continuing violation theory has been applied to cases where (1) a longstanding and demonstrable policy of discrimination exists, or (2) some evidence of present discriminatory activity giving rise to a claim of a continuing violation exists." *Ohio Civ. Rights Comm. v. Triangle Real Estate Servs., Inc.*, 10th Dist. No. 06AP-157, 2007-Ohio-1809, ¶ 22. Courts have recognized only two narrow exceptions of continuing violations that would toll the running of the statute of limitations: (1) an ongoing series of discriminatory acts; and (2) a long-standing policy of discrimination. *Dendinger v. Ohio,*

207 Fed.Appx. 521, 526 (6th Cir.2006), citing *Sharpe v. Cureton*, 319 F.3d 259, 266-67 (6th Cir.2003).

{¶ 100} In *Natl. R.R. Corp. v. Morgan*, 536 U.S. 101 (2002), the United States Supreme Court emphasized that the continuing violation doctrine is not applicable to discrete acts of discrimination, even those that are related to one another, unless it involves a hostile work environment claim. "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.* at 111. One example of the type of act that represents a discrete discriminatory act is the failure to promote. *Jones v. Goodyear Tire & Rubber Co.*, 9th Dist. No. 21724, 2004-Ohio-2821, ¶ 15, citing *Morgan* at 114. *Morgan* does not permit application of the continuing violation doctrine to discrete acts of which the plaintiff was aware at the time that they occurred and when the plaintiff has failed to present evidence of a long-standing policy of discrimination. *Bell v. The Ohio State Univ.*, 351 F.3d 240, 247-48 (6th Cir.2003). Appellant has failed to present evidence to establish such a long-standing policy of discrimination here. In addition, because the denial of a promotion is a discrete act, meaning it is easy to identify, the "continuing violation" theory is not applicable.

{¶ 101} Even if the continuing violation doctrine were applicable, appellant has not identified in his brief the promotion denials that were discriminatory in the six-year time period prior to the filing of this lawsuit. Thus, appellant has not identified the "continuing" violations that would permit inclusion of the 2000/2001 and 2002 claims.

{¶ 102} Moreover, even if the claims were not time-barred, appellant cannot establish his denial of promotion claims using indirect evidence.

{¶ 103} Without establishing how he has made his prima facie case and without setting forth Genpak's purported nondiscriminatory reasons for failing to promote him or the flaws in its assertions, appellant jumps immediately to the next step in the burden-shifting analysis under *McDonnell Douglas* and claims he has demonstrated pretext with respect to the reasons why he was not promoted when Hill was promoted in 2000/2001. Appellant argues this establishes genuine issues of material fact which preclude summary judgment. However, appellant has not presented evidence showing that Genpak's asserted reasons for declining to promote him are actually a pretext for race and/or national origin discrimination. Wilson testified his decision not to promote appellant was

due to appellant's lack of supervisory experience, his failure to attend management classes to compensate for this lack of experience, his attendance problems, and his lack of dependability. These are quite arguably valid, legitimate reasons for not promoting appellant. Appellant's efforts to offer explanations for his attendance difficulties after the fact do not change anything. There is no evidence in the record that these reasons are not the "real" reason appellant was not promoted or that discrimination was the "real" reason he was not promoted.

{¶ 104} Based upon the foregoing, we find appellant has failed to properly present either direct or indirect evidence to support his claim for racial discrimination in his failure to promote action. Accordingly, we overrule appellant's third and fourth assignments of error.

## B.    Fifth Assignment of Error – Negligent Retention & Negligent Supervision

{¶ 105} Finally, in his fifth assignment of error, appellant contends the trial court erred in granting summary judgment on his claims for negligent retention and supervision. Appellant asserts Ferguson subjected him to routine name-calling in the presence of managers and supervisors and, given that said supervisors were aware of the harassment, appellant argues he has met the elements necessary to establish these claims.

{¶ 106} In order to establish a claim for negligent supervision or retention, the following elements must be demonstrated: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Peterson* at 729, citing *Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 739 (10th Dist.1996). *See also Wagner v. Ohio State Univ. Med. Ctr.*, 188 Ohio App. 3d 65, 2010-Ohio-2561, ¶ 29 (10th Dist.). The elements of a negligent supervision claim are the same as those for a claim alleging negligent hiring or retention. *Browning v. OSHP*, 151 Ohio App.3d 798, 2003-Ohio-1108, ¶ 67 (10th Dist.), citing *Harmon v. GZK, Inc.*, 2d Dist. No. 18672, 2002-Ohio-545, citing *Peterson* at 729. The foreseeability aspect of a negligent supervision claim is also similar. *Browning* at ¶ 67.

{¶ 107} The first element, an employment relationship, has clearly been established. As for the second element, appellant asserts he has established incompetence by demonstrating racial and national origin harassment via Ferguson's routine name-calling in the presence of managers and supervisors, and via the presentation of the counterfeit "green cards," created by Ferguson, to the production manager.

{¶ 108} In addressing the second prong, we note that we have already determined in our analysis of appellant's first and second assignments of error that appellant has failed to demonstrate harassing behavior on the basis of race and/or national origin sufficient to create a hostile work environment. Demonstrating harassing behavior on the basis of race and/or national origin constitutes per se incompetent behavior. *See Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978, ¶ 42 (8th Dist.) (sexually harassing behavior is per se incompetent behavior). Because appellant did not present sufficient evidence to create a genuine issue of material fact concerning the alleged harassment based upon race and/or national origin, we do not believe appellant has established the required incompetence. Nevertheless, assuming for purposes of this particular analysis that he somehow has, we shall address the third prong of the test.

{¶ 109} Appellant claims he has met the third element of the test, arguing Genpak had actual or constructive knowledge of Ferguson's "incompetence," meaning his propensity to refer to an employee in a racially disparaging manner and to harass employees.

{¶ 110} As stated above, the third element of the test for negligent supervision and/or negligent retention is actual or constructive knowledge of the harassment on the part of the employer. Appellant claims Genpak's knowledge of the harassment was previously established as a result of: (1) Ferguson's comment calling an African-American employee a "nigger"; and (2) the sexual harassment allegations against Ferguson involving employee Siders, who purportedly claims Ferguson grabbed her face and forcibly attempted to kiss her. Appellant contends Genpak failed to take any action against Ferguson following these incidents (such as termination or, at a minimum, closer supervision), and if it had, Ferguson would not have been able to harass and thus injure appellant. Appellant claims Genpak's knowledge of the harassment has also been established by: (1) Ferguson's pattern of engaging in routine name-calling in the presence

of managers and supervisors; and (2) appellant's act of presenting the counterfeit "green cards" created by Ferguson to Genpak's production manager (Paulins).

{¶ 111} Negligent retention and supervision are negligence-based torts which require proof of the basic elements of negligence: duty, breach, proximate cause, and damages. *Abrams v. Worthington*, 169 Ohio App.3d 94, 2006-Ohio-5516, ¶ 15 (10th Dist.). The existence of a duty in a negligent retention case depends on the foreseeability of injury to the plaintiff. *Id.* at ¶ 15, citing *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989); *Wagner* at ¶ 23. The existence of an employer-employee relationship imposes a duty upon the employer to prevent foreseeable injury to others by exercising reasonable care to refrain from employing an incompetent employee. *Abrams* at ¶ 16.

{¶ 112} "Liability for negligent retention arises because the employer chooses to retain an employee who has a history of criminal, tortious, or otherwise dangerous conduct about which the employer knew or could have discovered through reasonable investigation." *Wagner* at ¶ 28, citing *Byrd v. Faber*, 57 Ohio St.3d 56, 61 (1991). *See also Abrams* at ¶ 14. "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Wagner* at ¶ 23, citing *Abrams*; *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984).

{¶ 113} " 'The foreseeability of a criminal act depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are 'somewhat overwhelming' that the defendant will be held liable.' " *Wagner* at ¶ 23; *Staten v. Ohio Exterminating Co., Inc.*, 123 Ohio App.3d 526, 530 (10th Dist.1997), quoting *Evans* at 742, citing *Feichtner v. Cleveland*, 95 Ohio App.3d 388, 396, (8th Dist.1994).

{¶ 114} First, despite such allegations in his reply brief, appellant has not cited to anything in the record which demonstrates that Siders made a complaint against Ferguson for sexual harassment as a result of an attempt to grab her face and forcibly kiss her. *See* App.R. 16(A)(6) and (7) and 16(D). Appellant has failed to point to anything in the record that proves this "fact" that he has asserted, aside from the statement he sets forth in his reply brief. Factual assertions which are not supported by a citation to the record should not be considered by the court on appeal.

{¶ 115} Furthermore, in order to defeat a motion for summary judgment, the adverse party must produce the type of evidence admissible pursuant to Civ.R. 56(C), which shows there is a genuine issue of material fact and the moving party is not entitled to judgment as a matter of law. Appellant has failed to point to any evidence admissible under Civ.R. 56(C) upon which the court could rely to support appellant's assertion regarding Siders' claim of discrimination and Genpak's knowledge thereof. No such admissible evidence has been produced here.

{¶ 116} To be sure, there is a passing reference in appellant's deposition mentioning that Siders had filed a claim against Genpak, but no details were provided regarding the allegations or against whom specifically the allegations are directed, other than it involves a discrimination claim. Significantly, there was neither a reference in the deposition testimony to Ferguson, nor an indication of the time period during which this alleged discrimination occurred, so it is unknown to us whether any purported incident involving Siders occurred before or after the incidents involving appellant, or, assuming it was reported to Genpak supervisors, whether such reporting occurred before or after the alleged incidents with appellant. Moreover, Siders' affidavit sheds no light on anything involving her personal allegations. Instead, the affidavit focuses solely upon the comment she purportedly heard Ferguson utter regarding appellant. We note that Siders' affidavit does state that she was employed at Genpak from September 23, 2009 to July 2010.

{¶ 117} Second, appellant's testimony that Ferguson referred to an African-American employee as a "nigger" on one occasion in the presence of the production manager when the subject employee was not present does not demonstrate that it was foreseeable to Genpak that Ferguson would engage in harassment against appellant based upon race and/or national origin.

{¶ 118} Assuming for purposes of this argument that the comment was indeed made in the presence of Paulins and heard by Paulins, it was one racial slur made in 2008. Although such a comment is extremely inappropriate and offensive, that one comment made under those circumstances does not demonstrate a viable claim for negligent retention and supervision. Ferguson did not have a history of criminal, tortious or otherwise dangerous conduct. In fact, there is evidence in the record showing that during the 13 years of Ferguson's 16-year tenure with Genpak that Wilson had been

employed as the plant manager, no employee had ever alleged to Wilson that Ferguson had engaged in racial or national origin harassment. Ferguson also averred in an affidavit that, prior to the instant case, no employee had ever accused him, to his knowledge, of workplace harassment or discrimination based upon race or national origin.

{¶ 119}  Third, contrary to appellant's assertions, he has not established a pattern of routine name-calling in the presence of supervisors and managers.

{¶ 120}  As previously noted, appellant testified at his deposition that supervisors Garrett and Halliday were sometimes present when Ferguson made comments involving his race and/or national origin. However, as we stated above, aside from a general comment that these two supervisors were sometimes present when Ferguson made comments, appellant did not provide any details about the type of comments being made or cite to specific incidents of when this occurred. Again, this is not sufficient to establish that these non-descript "comments" were actually racially disparaging or based upon national origin.

{¶ 121}  Appellant also testified that production manager Paulins was present sometimes when Ferguson made comments. However, according to appellant's deposition testimony, there were only two incidents for which Paulins was present and/or made aware of the incident. The first was in 2008 when appellant showed Paulins the two counterfeit "green cards." The second was in 2010, when appellant testified Paulins was present when Ferguson was talking to appellant about the television show "Gangland" and commented that appellant could have starred in the show. Appellant acknowledged that he did not report the 2010 "Gangland" comment to a supervisor or anyone else. Consequently, it would seem that appellant did not ask Paulins to take action against Ferguson for this comment or make a formal complaint.

{¶ 122}  While arguably offensive and/or demeaning, these incidents, which span a period of two to three years, do not constitute routine name-calling in the presence of supervisors and managers by which a reasonably prudent person would have anticipated that an injury was likely to result. As previously stated, the "Gangland" comment was vague, and it is unclear whether or not Paulins knew anything about the show or understood what appellant purports Ferguson was implying by referencing the show. And, although the incident involving the "green cards" was offensive and demeaning, this

incident occurred only one time. Appellant did, in fact, complain about this particular incident and, following said complaint, the "green cards" were never presented again. Appellant also testified he did not know if Paulins or another Genpak supervisor or manager ever addressed the issue with Ferguson. Thus, it is unknown whether or not Genpak intervened or took any action to prevent a recurrence of the behavior in the workplace, but the evidence shows that these particular cards were never used again.

{¶ 123} In conclusion, the totality of the circumstances at issue are not "somewhat overwhelming" and it cannot be said that a reasonably prudent person would anticipate that an injury was likely to result by way of Ferguson's conduct, based upon these circumstances. The prior behavior was legally insufficient to establish foreseeability for the purpose of appellant's negligent hiring and negligent retention claims. This court has previously required much more in order for there to be an issue as to whether the behavior was foreseeable. *See, e.g., Wagner* (physician with known chemical impairment issues and practicing under a consent agreement with the state had his medical license suspended and his clinical contract and privileges terminated by employer hospital; physician was known to have manipulated a former patient's pain pump to divert drugs to himself; genuine issue of material fact remained as to whether hospital should have reasonably foreseen the consequence of its decision to retain physician in a faculty/researcher position when physician harmed two former patients under the guise of conducting "research" by siphoning morphine from their pain pumps).

{¶ 124} Based upon Ferguson's history and the information which was known or should have been known to Genpak, it was not foreseeable, using a totality of the circumstances analysis, that Ferguson would allegedly injure appellant. Therefore, appellant cannot establish the third element of his negligent retention and negligent supervision claims. Consequently, because appellant has not established that Genpak had prior knowledge of Ferguson's incompetence, appellant cannot establish the fourth element (Genpak's act or omission caused appellant's injuries) or the fifth element (Genpak's negligence was the proximate cause of appellant's injuries). Because we find the trial court did not err in granting summary judgment on appellant's negligent retention and negligent supervision claims, we overrule appellant's fifth assignment of error.

## V. Disposition

{¶ 125} In conclusion, we overrule all five assignments of error presented by appellant. The judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

KLATT and DORRIAN, JJ., concur.

————————————