[Cite as *Ray v. Dept. of Health*, 2018-Ohio-2163.]

THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Carol Ray, | : | |
| Plaintiff-Appellant, | : | No. 17AP-526 (Ct. of Cl. No. 2015-01051) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| The Ohio Department of Health c/o Director Richard Hodges et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

_____

D E C I S I O N

Rendered on June 5, 2018

_____

**On brief:** *Adams & Liming LLC*, and *Sharon Cason-Adams*, for appellant. **Argued:** *Sharon Cason-Adams*.

**On brief:** *Michael DeWine*, Attorney General, *Peter E. DeMarco*, and *Timothy M. Miller*, for appellee Ohio Department of Health. **Argued**: *Peter E. DeMarco*.

_____

APPEAL from the Court of Claims of Ohio

BROWN, P.J.

{¶ 1} Plaintiff-appellant, Carol Ray, appeals from a judgment of the Court of Claims of Ohio which granted the Civ.R. 56 motion for summary judgment of defendant-appellee, Ohio Department of Health ("ODH"), finding appellant's termination was not based on her disabilities and that ODH was not required to engage in the interactive process with appellant for a reasonable accommodation.

{¶ 2} In 1990, appellant began working at ODH in the Office of General Counsel. She was an at-will employee. Appellant was diagnosed with depression after the birth of her son in 1993 and treated with medication. Her supervisor at that time, Jodi Govern,

knew appellant was required by her health insurance company "to go see a psychiatrist" to obtain coverage for her medication. (Ray Depo. at 110.) Appellant testified she had worked with Lance Himes since 2004, and had discussed her health conditions with him. In April 2011, appellant's daughter passed away. Appellant was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), in addition to her depression. In September 2011, Govern left the employment of ODH; in late 2011, Himes was appointed general counsel, and appellant reported directly to Himes. In approximately February 2014, Himes became interim director, and Mahjabeen Qadir was named interim acting general counsel.

{¶ 3} Appellant stated that her workload from 2011 through August 2012 was overwhelming and heavier than she had experienced previously. In 2012 or 2013, Dr. Ted Wymslo, the former director, mentioned to Himes that he was concerned about appellant and suggested sending her for an independent medical exam ("IME"). Himes stated that Dr. Wymslo "worked late often, as did Carol, and when he would walk out, Carol would still be in the office. He would walk past her office. She would be either in a bad or low mood, might tear up when she's sharing with him." (Himes Depo. at 90.) Himes declined to send appellant for an IME at that time, but he did discuss his concerns with appellant. He also reassigned some of her duties to help manage her workload.

{¶ 4} Himes testified he never disciplined or put appellant on a performance improvement plan. However, after the first review he conducted in 2011, Himes indicated to appellant that she could be more effective if she did not exhibit strong emotions in meetings. In that evaluation, Himes wrote that " '[s]he regularly provides her program areas with accurate, timely, and thoughtful legal analysis. * * * Her advice is well written and comprehensive. Carol identifies the right legal issues and offers solutions based in law, an asset to the department.' " (Himes Depo. at 48.)

{¶ 5} Between March 2014 and June 6, 2014, several incidents occurred that ODH cited as reasons for appellant's termination. Himes stated that he terminated appellant because she exhibited "[u]nprofessional conduct, embarrassing conduct, [and an] inability to work with colleagues/program staff." (Himes Depo. at 62.) The first incident, on March 26, 2014, involved a complaint from two co-workers regarding a telephone call from appellant to an ODH vendor to discuss a contract. The co-workers, Sean Keller and Nicole Brennan, complained to Qadir that appellant had called a vendor without program

employees requesting that she do so, and without their input regarding a contract modification. Qadir testified that Keller informed her the vendor then telephoned him to complain about appellant's "negative" tone, "aggressive" style, and the fact the vendor felt "intimidated." (Qadir Depo. at 95.) Keller and Brennan were concerned that appellant had damaged ODH's relationship with the vendor.

{¶ 6} Later that day, Qadir called Vanessa Harmon-Gouhin, the other contracts attorney, to discuss the general contracts process in order to have a non-biased perception of the role of the contracts attorney before speaking to appellant. Qadir also discussed a separate employee matter with Harmon-Gouhin. While Qadir was on the telephone, appellant entered Qadir's office "very quickly, surprised me." (Qadir Depo. at 108.) Appellant wanted Qadir to discuss the matter with her, rather than Harmon-Gouhin. Qadir testified that appellant "continued to yell [at her] until she decided to leave," and she slammed Qadir's office door. (Qadir Depo. at 110.) Approximately 15 minutes later, appellant entered Qadir's office again without knocking and started to yell at Qadir "and accused [Qadir] of excluding her and saying she could be trusted." (Qadir Depo. at 117.) Qadir stated that appellant was "completely disrespectful" and "unprofessional." (Qadir Depo. at 117.)

{¶ 7} Qadir talked to Will McHugh, the assistant director of health at that time, and Jaime Erickson, chief of human resources,[1] regarding the outbursts and how to proceed regarding the complaint about appellant with the vendor. On March 28, 2014, appellant again went to Qadir's office. Qadir stated that appellant had tears in her eyes. Appellant was upset that Qadir had not talked to her regarding the March 26 incident, and that Qadir did not respect appellant's abilities or experience. Appellant testified that Qadir called appellant "paranoid, crazy -- not paranoid, crazy." (Ray Depo. at 201.) Qadir stated she told appellant:

> [B]efore she comes in my office, she needs to knock. She can't speak to me rudely. She can't yell at me. She can't be disrespectful, condescending. Communication is a two-way street. She told me she didn't do any of those things. I said, you know, "You're yelling at me right now at this very moment." She didn't see what she was doing as yelling,

---

[1] In 2014, her job title was chief of employee services, which later involved a change to her title but not job responsibilities.

> instead she thought that her voice was simply elevated. She was waving her arms around in a rapid and exasperated manner. Her eyes were getting teary again.

(Qadir Depo. at 126-27.)

{¶ 8} After the meeting, appellant telephoned Himes on his cell phone and explained she was having difficulties with Qadir and asked him not to share any information regarding her mental health with Qadir. Qadir again met with McHugh and Erickson to update them regarding appellant's behavior. They decided to discuss the incident with Himes. Qadir testified that she recommended termination because:

> [W]ithin a few short days, her being completely rude and disrespectful toward me, trying to -- she basically made me uncomfortable with her behavior, and she was choosing to be rude. She was choosing to disrespect her supervisor. She clearly didn't think that she needed to respect me. That sort of behavior to me is indicative of an employee that I don't know if I'm going to be able to rely upon their advice to me. She was insubordinate.

(Qadir Depo. at 136.)

{¶ 9} Qadir explained that appellant was insubordinate by "[m]aking a face and saying it was me, comparing me to her child; saying that I had a boyfriend and now I don't and that's why I'm treating her poorly; yelling at me; you know, just being disrespectful the entire time she was in my office." (Qadir Depo. at 136.) Himes decided to send appellant for an IME to "make sure she was okay, to see if something else was going on." (Himes Depo. at 72.) Himes testified he was cognizant of the anniversary of appellant's daughter's death, which was a factor in his decision to send appellant for an IME.

{¶ 10} Belinda Kerr, human resources administrator, scheduled an IME for appellant with Nick Marzella, Ph.D. After the IME, Dr. Marzella issued his psychological fitness-for-duty evaluation and diagnosed appellant with major depression by history, ADHD, and histrionic personality traits and features. Dr. Marzella reported that "[t]hough these traits and features do not rise to the level of a personality disorder, they will nonetheless bring her into more conflict with her environment than most of her peers." (Plaintiff's Ex. at 8.) Dr. Marzella also noted appellant may have difficulty understanding the impact of her behavior on others.

{¶ 11} Kerr received the results of the IME and informed appellant she was "cleared to work" and responsible for her actions in the workplace. (Kerr Depo. at 98.) Kerr testified she shared the results of the IME with Himes and Qadir, but did not discuss the doctor's diagnoses. Erickson did not read the report thoroughly.

{¶ 12} Appellant met with Qadir and McHugh on April 16, 2014, during which Qadir and McHugh explained that appellant was given a new position description. Qadir testified she gave appellant a list of expectations, including better communication. Qadir, McHugh, and Harmon-Gouhin testified that Harmon-Gouhin was to be the primary attorney for all contracts, and appellant would no longer supervise Harmon-Gouhin. Appellant testified that she recalled at the meeting Qadir assigned her to the smoke-free program and told her to continue with the contracts until July.

{¶ 13} On May 29, 2014, appellant attended two separate program procurement meetings. Appellant testified the meetings were uncomfortable, and that a co-worker, Carol Cook, accused appellant of going on a "fishing expedition" because appellant continued to ask questions. (Ray Depo. at 321.) After the meeting, Paul Maragos, chief of procurement, e-mailed Harry Kadmar, chief financial officer, McHugh and Qadir, and asked that appellant be removed from attending future regularly scheduled procurement meetings.

{¶ 14} Following that e-mail, Elaine Stewart, labor relations administrator, conducted an investigation of the incidents and gathered witness statements from employees who attended the meetings, including Keller, Cook, Harmon-Gouhin, and Reginald Surmon, but not appellant. Stewart issued an investigative report on June 4, 2014 concluding that witnesses reported appellant acted in an unprofessional manner and communicated in an aggressive manner.

{¶ 15} On June 5, 2014, in the late afternoon, Himes met with Qadir and Erickson and decided to terminate appellant's employment; Himes concluded that appellant "did not have the ability to perform the duties because she couldn't get along with and be a team player with the programs that she was assigned to work with and advise." (Himes Depo. at 136.)

{¶ 16} Appellant testified that she met with Qadir after business hours on June 5, 2014, and asked to transition out of the day-to-day contract process as a reasonable accommodation to reduce her increased anxiety. Qadir denied the meeting took place. On

June 6, 2014, Himes signed appellant's letter of termination; that morning, Erickson informed appellant that her employment was being terminated.

{¶ 17} On December 22, 2015, appellant filed a complaint in the Court of Claims asserting disability discrimination in violation of Ohio law, failure to accommodate in a disability discrimination claim, disability discrimination in violation of the Americans with Disabilities Act ("ADA"), and a failure to accommodate in violation of the ADA. On March 15, 2017, ODH filed a motion for summary judgment and appellant filed a motion for partial summary judgment. On June 21, 2017, the Court of Claims granted ODH's motion for summary judgment.

{¶ 18} On appeal, appellant sets forth the following four assignments of error for this court's review:

> [I.] The trial court erred when it ruled that Appellant failed to present direct evidence of disability discrimination in violation of the Americans with Disabilities Act and Ohio law.
>
> [II.] The trial court erred when it ruled that Appellant failed to present sufficient evidence that the employer's stated "legitimate non-discriminatory" reason for Appellant's discharge was, in fact, pretext for disability discrimination.
>
> [III.] The trial court erred when it ruled that Appellant failed to prove that Appellee violated the ADA and Ohio law by failing to accommodate her disability.
>
> [IV.] The lower court erred by overruling Appellant's Motion for Summary Judgment and by granting Appellee's Motion for Summary Judgment.

{¶ 19} Appellant's four assignments of error, all raising various challenges to the decision of the Court of Claims granting summary judgment in favor of ODH and denying appellant's motion for partial summary judgment, will be addressed jointly. Through these assignments of error, appellant contends the Court of Claims erred in its ruling that: (1) appellant failed to present direct evidence of disability discrimination, (2) appellant failed to present sufficient evidence that the employer's stated legitimate non-discriminatory reason was pretext for disability discrimination, (3) appellant failed to prove that ODH violated the ADA and Ohio law by failing to accommodate her disabilities, and

(4) in denying her motion for partial summary judgment and granting appellee's motion for summary judgment.

{¶ 20} "Pursuant to Civ.R. 56(C), summary judgment is proper when '(1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can only reach one conclusion which is adverse to the non-moving party.' " *Brust v. Franklin Cty. Sheriff's Office*, 10th Dist. No. 16AP-881, 2017-Ohio-9128, ¶ 14, quoting *Lee v. Cleveland*, 151 Ohio App.3d 581, 2003-Ohio-742, ¶ 16 (8th Dist.). This court reviews the granting of a summary judgment motion de novo. *Id.*

{¶ 21} We first address appellant's argument that the Court of Claims erred in granting ODH's motion for summary judgment on her disability discrimination claim. R.C. 4112.02(A) prohibits discrimination based on disabilities as follows:

> It shall be an unlawful discriminatory practice:
>
> For any employer, because of * * * disability * * * to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

{¶ 22} The Supreme Court of Ohio has explained that discrimination actions under federal and state law each require the same analysis. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981); *Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.*, 61 Ohio St.3d 607, 609-10 (1991). Ohio courts may look to both federal and state courts' statutory interpretations of both federal and state statutes when determining the rights of litigants under state discrimination laws. *Dautartas v. Abbott Labs.*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 24, citing *Miller v. Potash Corp. of Saskatchewan, Inc.*, 3d Dist. No. 1-09-58, 2010-Ohio-4291, ¶ 16.

{¶ 23} In order to prevail in her employment discrimination case, appellant must prove discriminatory intent and may establish such intent through either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). "[A] plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory

intent." *Mauzy* at paragraph one of the syllabus. In the absence of the direct method of proof of discrimination, a plaintiff may indirectly demonstrate discriminatory intent using the analysis provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

{¶ 24} A plaintiff must first establish a prima facie case of discrimination. *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 14, citing *McDonnell Douglas*. To prevail on a claim of disability discrimination under Ohio law, appellant must establish: (1) that she was disabled, (2) that an adverse employment action was taken, at least in part, because of her disabilities, and (3) that she, although disabled, can safely and substantially perform the essential functions of the job. *Taylor v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 11AP-385, 2011-Ohio-6060, ¶ 19. Since an employee must prove all three elements in order to establish a prima facie case of disability discrimination, the failure to establish any single element is fatal to a discrimination claim. *Id.* at ¶ 20.

{¶ 25} If the plaintiff demonstrates a prima facie case of discrimination, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. *Temesi* at ¶ 14. If the employer does so, then the burden again shifts to the plaintiff to demonstrate " 'that the proffered reason was not the true reason' " for the adverse employment action. *Id.*, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In general, "courts have found that a plaintiff establishes pretext by proving one or more of the following: (1) that the employer's proffered reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons were not the true reason(s), or (3) that the proffered reason(s) were insufficient to motivate discharge." *Nelson v. Univ. of Cincinnati*, 10th Dist. No. 16AP-224, 2017-Ohio-514, ¶ 35. Plaintiff has the ultimate burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). "A case that reaches this point is decided by the trier of fact on the ultimate issue of whether the defendant discriminated against the plaintiff." *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 14.

{¶ 26} A disability is a "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13). We note there was no argument in this case regarding

whether appellant suffered from a disability because ODH conceded, for purposes of summary judgment, that appellant stated a prima facie case of disability discrimination.

{¶ 27}  Appellant argues she presented direct evidence to support her claim for disability discrimination and that the Court of Claims erred in finding she failed to present such direct evidence.  Under Ohio law, "[d]irect evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.  * * * If that evidence is credible, 'discriminatory animus may be at least part of an employer's motive, and in the absence of an alternative, non-discriminatory explanation for that evidence, there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court.' " *Ceglia v. Youngstown State Univ.*, 10th Dist. No. 14AP-864, 2015-Ohio-2125, ¶ 16, quoting *Norbuta v. Loctite Corp.*, 1 Fed.Appx. 305, 312 (6th Cir.2001).  "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003).

{¶ 28}  Appellant argues Himes admitted he terminated her for behavior that caused him to question her mental health.  Appellant further contends the incidents which led him to conclude that an IME was necessary were the same incidents Himes used to justify her termination.

{¶ 29} Himes' testimony, however, does not constitute direct evidence of discrimination.  Both Ohio and federal courts have concluded that the act of an employer sending an employee to an IME does not constitute evidence that the employer perceived the employee as disabled.  *Dalton v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-827, 2014-Ohio-2658, ¶ 31; *Ames v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-119, 2014-Ohio-4774, ¶ 29.  Moreover, the complaints regarding appellant's behavior at the two meetings on May 29, 2014 occurred subsequent to the IME and, therefore, could not constitute a basis for sending her to have an IME.

{¶ 30} Appellant argues this case is similar to *Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F.Supp.2d 469 (S.D.Ohio 2012).  In *Wells*, the plaintiff was suspended from her nursing position pending the outcome of a fitness-for-duty evaluation.  The plaintiff was examined by three doctors; the first doctor concluded the plaintiff should not be

allowed to work in a clinical setting and posed a risk to her patients. The plaintiff saw the second doctor, a psychologist, for substance abuse counseling, and this doctor concluded plaintiff could return to work during counseling. However, after approximately six weeks, the doctor provided a follow-up report explaining that he and the plaintiff had mutually agreed to terminate counseling because the plaintiff was not prepared to admit she had a substance abuse problem. Finally, the plaintiff's own physician provided a note stating she could return to work without restrictions.

{¶ 31} The employer in *Wells* refused to reinstate the plaintiff because her medical condition rendered her incapable of performing her duties. The plaintiff's supervisor testified in part: "It was not whether or not they decided she was ready to come back, it was that she was still having medical issues, and those issues had caused her to have practice issues, or could have caused her to have practice issues." *Id.* at fn. 4. The court in *Wells* found the supervisor's admission constituted direct evidence that plaintiff's impairment was the reason she was not reinstated.

{¶ 32} We find *Wells* to be distinguishable from the instant case, as ODH did not refuse to reinstate appellant after her IME indicated she was fit for duty without an accommodation. Moreover, Himes did not admit that he believed appellant was incapable of performing her duties because of medical issues.

{¶ 33} Appellant also argues that Qadir called her "paranoid" and "crazy." However, appellant failed to argue this to the Court of Claims as direct evidence of disability discrimination. In general, "a party waives the right to raise an argument on appeal that it could have raised, but did not, in earlier proceedings." *Union Sav. Bank v. Schaefer*, 10th Dist. No. 13AP-222, 2013-Ohio-5704, ¶ 28, citing *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34. Furthermore, appellant testified she told Himes not to reveal to Qadir anything regarding her disabilities. Qadir testified she did not know about appellant's disabilities. In the absence of knowledge on the part of Qadir of appellant's disabilities, this comment cannot constitute direct evidence of disability discrimination. Accordingly, we conclude the Court of Claims did not err in finding that appellant failed to present direct evidence of disability discrimination.

{¶ 34} Without direct evidence of disability discrimination, appellant's claim must be analyzed using the indirect method of proof pursuant to the *McDonnell Douglas*

framework. Appellant argues the Court of Claims erred in finding that she failed to present sufficient evidence that the employer's stated legitimate, non-discriminatory reason was pretext for disability discrimination. ODH conceded, for purposes of summary judgment, that appellant stated a prima facie case of disability discrimination: She suffered a mental disability (depression and ADHD); she was otherwise qualified for her position with or without an accommodation; her employment was terminated; and ODH knew or had reason to know of her disabilities. Thus, the burden of production shifted to ODH to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. ODH produced evidence of multiple co-workers' complaints regarding appellant's aggressive and unprofessional behavior. (*See* Depos. of Qadir; Harmon-Gouhin, and Maragos.) Here, the deposition testimony supported various instances of unprofessional behavior and examples of appellant's inability to work compatibly with her co-workers, and the Court of Claims found, even construing the evidence most strongly in appellant's favor, that ODH had legitimate, non-discriminatory reasons to terminate appellant's employment.

{¶ 35} Appellant argues the Court of Claims erred in finding she failed to present sufficient evidence that the employer's stated legitimate, non-discriminatory reason was pretext for disability discrimination. ODH presented evidence, however, that it terminated appellant's employment due to her "[u]nprofessional conduct, embarrassing conduct, inability to work with colleagues/program staff." (Himes Depo. at 62.) Himes testified that appellant "has a style that can be aggressive, it can be condescending, it can be off putting." (Himes Depo. at 22.) Himes stated that some co-workers found her style "abusive." (Himes Depo. at 22.)

{¶ 36} ODH also presented evidence that a vendor complained about appellant's behavior during a telephone call. The vendor indicated she felt intimidated and that appellant had acted unprofessionally. Maragos requested appellant be removed from attending regularly scheduled procurement meetings because of her confrontational manner resulting in unproductive meetings and damaged working relationships. Maragos, who was concerned that Cook and Harmon-Gouhin would seek other employment, testified that appellant's behavior caused stress. Qadir testified appellant was rude and unprofessional to her on several occasions. Such evidence amounts to a legitimate, non-

discriminatory reason. "So long as the employee's misconduct is related to the performance of her job, an employer may discipline or terminate the employee even if her misconduct was caused by her disability." (Citations omitted.) *Sper v. Judson Care Ctr., Inc.*, 29 F.Supp.3d 1102, 1110 (S.D.Ohio 2014).

{¶ 37} In order for appellant to demonstrate that ODH's stated reasons for terminating her employment were pre-textual and not the true reasons, appellant must demonstrate that:

> (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action.

*Hartman v. Ohio Dept. of Transp.*, 10th Dist. No. 16AP-222, 2016-Ohio-5208, ¶ 21, quoting *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 77, citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).

{¶ 38} Appellant acknowledges she called a vendor to discuss a contract, and the evidence reveals there was an internal complaint about the telephone call. Appellant also acknowledges she and Qadir had stressful meetings; specifically, appellant admits that the two meetings on May 29, 2014 were stressful and loud, and that Maragos asked that she be removed from further procurement meetings after these two meetings. Despite admitting these events occurred, appellant maintains ODH is exaggerating and that the events are insufficient to justify her termination. Appellant contends it is ODH's "discriminatory animus" that led to her termination. (Appellant's Brief at 31.)

{¶ 39} Appellant cannot demonstrate that the stated reasons had no basis in fact, especially in light of her acknowledgement that the incidents occurred. Appellant also cannot demonstrate that the incidents cited as the basis for her termination were pre-textual reasons. As discussed, Qadir calling appellant "paranoid" or "crazy" cannot be the result of discrimination because Qadir was unaware of appellant's disabilities. Furthermore, Maragos testified that he sent management the e-mail requesting appellant be removed from future procurement meetings. Maragos noted he had never before, in his employment at ODH, made such a request. According to Maragos, appellant "is very good at knowing what the rules and regulations say. She's very knowledgeable about the department. I can't tell you how many years of experience, but she's pretty much worked

with many different programs. Not very many people have that wide range of knowledge." (Maragos Depo. at 52-53.)

{¶ 40} However, when Maragos was asked if the problem with appellant involved difficulty building positive relationships, he replied: "Yes, it was getting to a point that what [appellant] was bringing to the table wasn't outweighing the issues that were happening with people, issues that were going on." (Maragos Depo. at 53.) Maragos further testified that, even though appellant had been difficult to work with in the past, the situation was worsening to the point where he asked that she be removed from future procurement meetings because "[t]he situation is becoming detrimental to our team and is not healthy." (Plaintiff's Ex. at 20.) Similarly, Harmon-Gouhin testified that her working relationship with appellant was initially good, but that uncomfortable interactions occurred over the ensuing months, leading Harmon-Gouhin to avoid interactions with appellant. According to the testimony of Qadir, Harmon-Gouhin came into Qadir's office in May 2014 and was in tears, complaining she was having problems with appellant and was considering quitting her job at ODH. In light of the record presented, appellant cannot demonstrate that the reasons given for her termination were pre-textual.

{¶ 41} Appellant argues the Court of Claims erred when it ruled she failed to prove that ODH violated the ADA and Ohio law by failing to accommodate her disabilities. Appellant testified that on June 5, 2014, at approximately 6:00 p.m., she requested that Qadir remove her from working on contracts as an accommodation to relieve her stress. According to appellant, Qadir told her to "[g]o home and get some rest." (Ray Depo. at 265.) By contrast, Qadir testified she did not meet with appellant and that appellant did not ask for an accommodation. Himes and Qadir testified that the decision to terminate appellant's employment had already been determined the afternoon of June 5, 2014, but Himes just signed the termination letter on the morning of June 6, 2014. (*See* Himes Depo. at 118; 132-33; Qadir Depo. at 227.)

{¶ 42} In accordance with the ADA, "an employer must make 'reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee' unless it can prove that such an accommodation would impose an 'undue hardship' on the business." *Yarberry v. Gregg Appliances, Inc.*, 625 Fed.Appx. 729, 741 (2015), citing 42 U.S.C. 12112(b)(5)(A). However,

an employer is not required to rescind discipline, including termination, or to engage in further discussions if the request for accommodation is made after the misconduct occurs and the decision to discipline is made. *Id.* at 742. Further, "[t]he timing of a request is crucial." *Id.* Here, assuming appellant's request constitutes a reasonable accommodation as defined in the ADA, Himes had already made the decision to terminate appellant before her request for an accommodation was made. ODH, therefore, was not required to consider the request for an accommodation.

{¶ 43} Finally, in her fourth assignment of error, appellant argues the Court of Claims erred in denying her motion for summary judgment and granting ODH's motion for summary judgment. However, appellant makes no further argument to advance this assignment of error, other than issues we have previously addressed. Based on this court's de novo review, we find appellant's termination was not attributable to her disabilities and that ODH was not required to engage in the interactive process for a reasonable accommodation. Finding no genuine issues as to any material fact, we conclude the Court of Claims did not err in granting ODH's motion for summary judgment. Accordingly, appellant's four assignments of error are not well-taken and are overruled.

{¶ 44} Based on the foregoing, appellant's four assignments of error are overruled, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

TYACK and DORRIAN, JJ., concur.

_____