[Cite as *Leach v. Ohio State Univ.*, 2024-Ohio-5694.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Montee Leach, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 24AP-111 |
| v. | : | (Ct. of Cl. No. 2022-00305JD) |
| The Ohio State University, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 5, 2024

**On brief:** *Hilton Parker LLC, Jonathan L. Hilton,* and *Geoffrey C. Parker,* for appellant. **Argued:** *Jonathan L. Hilton.*

**On brief:** *Dave Yost,* Attorney General, *Timothy M. Miller,* and *Randall W. Knutti,* for appellee. **Argued:** *Timothy M. Miller.*

APPEAL from the Court of Claims of Ohio

LUPER SCHUSTER, J.

{¶ 1} Plaintiff-appellant, Montee Leach, appeals from a judgment entry of the Court of Claims of Ohio granting the motion for summary judgment of defendant-appellee, The Ohio State University ("OSU"). For the following reasons, we affirm.

I. Facts and Procedural History

{¶ 2} Leach, a black male, worked as a police officer for the OSU police department in December 2019 until he was terminated from his position on May 30, 2020. As a new hire, Leach was subject to a probationary period of employment which lasted for the entire duration of Leach's employment with OSU. Probationary employees do not receive the full protections from the collective bargaining agreement between the OSU police department

and the union. The collective bargaining agreement provides the OSU police department can only terminate a non-probationary officer for just cause. However, the OSU police department may terminate the employment of a probationary officer for any reason that is not illegal.

{¶ 3} Leach spent the first few weeks of his employment with OSU participating in classroom training. During those classroom sessions, Leach contends he was subject to discrimination from Lieutenant Joanna Shaul, a white female. Though Leach described Lieutenant Shaul as being rude to all recruits when administering a test, he alleges she was ruder and more arrogant toward him and the other male recruit than she was toward female recruits.

{¶ 4} During his probationary period of employment, Leach was the subject of an internal investigation by the OSU police department stemming from a report of an alleged instance of domestic violence. The report came from Renee Romero, the mother of Leach's child. Leach and Romero were previously involved in a romantic relationship, but Leach testified in his deposition he ended the relationship before Christmas 2019. In his internal investigation interview, however, Leach told investigators he ended the relationship for good after February 28, 2020. After ending the romantic relationship, Leach continued to live with Romero and their daughter through April 5, 2020. Leach described their relationship as volatile, and he alleged Romero physically abused him on several occasions.

{¶ 5} During the early morning hours of April 5, 2020, Romero entered Leach's bedroom and woke him up. Leach recorded the interaction on his cell phone. Leach described Romero as drunk, and Romero demanded the two rekindle their relationship. When Leach refused, Romero told him she would "ruin" him. (Leach Depo. at 80.) Leach tried to leave the room, but Romero blocked his way, though he eventually managed to leave.

{¶ 6} Romero called the Reynoldsburg police department. Both Leach and Romero gave statements to police, and no charges were filed against either of them following the incident. The police report states Romero had a very small scratch on her hand but "[d]ue to the appearance and location of the scratch, it did not appear that the scratch was caused by someone attempting to cause physical harm to Romero." (Shaul Aff. Ex. J at 8.)

{¶ 7} Romero reported the incident directly to the OSU police department Chief of Police, Kimberly Spears-McNatt, as an instance of domestic violence. As a result of Romero's report of the incident, the OSU police department commenced an internal affairs investigation. The investigation conducted by Lieutenant Shaul sought to determine whether Leach violated four provisions of the OSU police department's General Orders.

{¶ 8} Through the investigation, the OSU police department learned of several instances in which Leach damaged property in his residence out of anger. One such incident occurred when Leach spoke to Romero while she was on vacation and she made inflammatory comments about who would protect their daughter if they were not in a relationship. Leach said he punched the wall of his residence out of frustration that he could not do anything about the situation. In another instance that occurred that same week, Leach punched both his closet and a door out of frustration with Romero, causing damage to both. Romero told investigators of a third instance of property damage in October 2019 in which Leach punched a hole through the drywall in the hallway of his residence after Romero received a text message about another man. Romero and Leach provided conflicting reports about whether this incident occurred while Leach was home alone or whether Romero and their daughter were present.

{¶ 9} Leach told investigators he started recording interactions with Romero in December 2019 so he could not be accused of wrongdoing. Leach provided recordings from February 28 and April 5, 2020 to investigators.

{¶ 10} At the conclusion of the investigation, Lieutenant Shaul issued a written internal investigation report. The investigation determined there was no evidence that Leach had committed domestic violence, and there was no dispute Romero had been physically violent toward Leach. Nonetheless, Lieutenant Shaul's report stated:

> However, on multiple occasions and by his own admission, Officer Leach allowed verbal statements to provoke his emotions to the point of losing control. This loss of control resulted in multiple instances of significant property damage. Further, his behavior for the last several months demonstrates an unacceptable lack of judgment and perception. In law enforcement, we cannot control the actions or words of those we encounter. We must, however, control our own actions and responses to those around us. The facts in this case show Officer Leach has repeatedly been unable or unwilling to control his actions. Ultimately, I conclude that Officer Leach's

behavior does not meet the high standards required of an Ohio State University Police Officer.

(Spears-McNatt Aff., Ex. E at 26.)

{¶ 11} Ultimately, Lieutenant Shaul concluded Leach violated the OSU police department's General Order 1.3 – Private Life. General Order 1.3 provides:

> Division employees will behave in a manner that does not bring discredit to their agencies or themselves. A law enforcement employee's character and conduct while off duty must always be exemplary, thus maintaining a position of respect in the community in which he or she lives and serves. The employee's personal behavior must be beyond reproach.

(Spears-McNatt Aff., Ex. E at 27.) Additionally, Lieutenant Shaul concluded Leach violated General Order 26.1 – Code of Conduct, which requires that officers "[c]onduct their private and professional lives in such a manner as to avoid bringing the police division or The Ohio State University into disrepute." (Spears-McNatt Aff., Ex. E at 27.)

{¶ 12} After receiving Lieutenant Shaul's report, Chief Spears-McNatt agreed with Lieutenant Shaul's findings and conclusions. Because of the nature of the violations of the General Orders, Chief Spears-McNatt was required to send the investigation report to the human resources department.

{¶ 13} David Simpson, the manager of labor relations within OSU's human resources department, made the determination to terminate Leach's employment based on the information he received, including the internal affairs investigation. Simpson testified at his deposition that he generally relies "on the evidence that the department has presented in their request for probationary removal." (Simpson Depo. at 24.) OSU terminated Leach's employment on May 30, 2020.

{¶ 14} Leach then filed a complaint regarding the internal investigation with OSU's Office of Institutional Equity. The Office of Institutional Equity conducted its own investigation and concluded:

> Notwithstanding troubling comments made to Leach that have a general victim-blaming tenor, there is no evidence that Leach's perceived lack of empathy was based on Leach's protected classes and/or that [Lieutenant] Shaul would have arrived at a different conclusion if Leach were not Black, not a man, or both. Additionally, Leach asserted that the conduct referenced in the [OSU Police Department Internal Affairs]

report does not have a work nexus. However, the General Orders of [the OSU Police Department] have been similarly supplied previously, which fails to suggest that the application herein was based on Leach's protected classes.

(Spears-McNatt Depo. Ex. 1 at 5.)

{¶ 15} Following his termination, Leach filed a complaint against OSU asserting claims of employment discrimination based on sex and race, hostile work environment, and breach of contract. On June 29, 2022, OSU filed a motion for partial dismissal, seeking to dismiss Leach's claim for breach of the collective bargaining agreement for lack of jurisdiction pursuant to Civ.R. 12(B)(1). The Court of Claims granted OSU's motion for partial dismissal in an October 26, 2022 entry, finding it does not have jurisdiction over a claim for breach of contract based on alleged violations of a collective bargaining agreement. Instead, the court determined that R.C. 2743.03(A)(1) gives exclusive jurisdiction to the courts of common pleas over actions alleging violations of a collective bargaining agreement.

{¶ 16} On September 22, 2023, OSU filed a motion for summary judgment on Leach's remaining claims of employment discrimination and hostile work environment. In its motion, OSU argued Leach cannot state a prima facie case of discrimination because he cannot show that another similarly situated comparable employee was treated more favorably than he was. Additionally, OSU argued the evidence demonstrated it terminated Leach's employment for legitimate, non-discriminatory reasons that were not a pretext for discrimination. Leach responded to the motion for summary judgment on October 10, 2023. Leach conceded he could not state a prima facie case of discrimination using the indirect method of proof because he has identified no similarly situated probationary employee who was treated more favorably than he was. However, Leach argued summary judgment was inappropriate because OSU failed to show there was no genuine issue of material fact as to whether Leach put forth direct evidence of discrimination.

{¶ 17} In a January 10, 2024 decision, the Court of Claims determined Leach did not identify any direct evidence of discrimination and concluded there were no genuine issues of material fact as to Leach's discrimination claim. Further, the court found that even if Leach had pointed to any direct evidence of discrimination, OSU was able to demonstrate it would have terminated Leach's probationary employment "based upon his

own conduct and temperament." (Jan. 10, 2024 Decision at 14.) The court additionally determined there were no genuine issues of material fact as to Leach's hostile work environment claim. Thus, the court granted OSU's motion for summary judgment and entered judgment in favor of OSU on Leach's claims of discrimination and hostile work environment, journalizing its findings in the January 10, 2024 decision and judgment entry. Leach timely appeals both the entry of partial dismissal and the decision and judgment entry granting OSU's motion for summary judgment.

## II. Assignments of Error

{¶ 18} Leach assigns the following three assignments of error for our review:

> [I.] The trial Court erred as a matter of law by finding that the University's seven-word reference to Montee having "no direct evidence of discrimination" carried the University's initial burden of production on its motion for summary judgment.
>
> [II.] Lt. Shaul was the key decisionmaker whose findings resulted in Montee's termination. The trial Court erred when it found that—as a matter of law—her remark that she noted the public's perception of "what an abuser looks like" could not constitute any evidence of discrimination against Montee, a Black male.
>
> [III.] Plaintiff Montee Leach was a member of a collective bargaining agreement with the University. This Court held in another case that a statute, R.C. 4117.09, may give the Court of Common Pleas exclusive jurisdiction over collective bargaining agreements. But the University her[e] failed to include an arbitration clause in the collective bargaining agreement—a prerequisite for R.C. 4117.09 to confer jurisdiction on the Common Pleas court. The trial Court erred when it dismissed Montee's collective bargaining agreement claims for lack of jurisdiction.

## III. First and Second Assignments of Error – Motion for Summary Judgment

{¶ 19} Leach's first and second assignments of error are interrelated, and we address them together. In his first assignment of error, Leach argues the Court of Claims erred in determining OSU satisfied its initial burden of demonstrating no genuine issue of material fact exists for purposes of summary judgment on his claim of employment discrimination. In his second assignment of error, Leach argues the court erred in concluding he did not

put forth direct evidence of discriminatory intent. Taken together, these two assignments of error assert the court erred in granting OSU's motion for summary judgment on Leach's employment discrimination claim. Leach does not raise any arguments related to the court's granting summary judgment to OSU on the hostile work environment claim.

{¶ 20} An appellate court reviews summary judgment under a de novo standard. *Estate of Sample v. Xenos Christian Fellowship, Inc.*, 10th Dist. No. 20AP-563, 2021-Ohio-3898, ¶ 9. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 21} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the non-moving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the non-moving party has no evidence to support the non-moving party's claims. *Id.*; *Vahila v. Hall*, 77 Ohio St.3d 421, 429 (1997). Once the moving party discharges its initial burden, summary judgment is appropriate if the non-moving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial. *Dresher* at 293; *Vahila* at 430; Civ.R. 56(E).

{¶ 22} Leach claims that OSU discriminated against him on the basis of his race and sex. R.C. Chapter 4112 governs anti-discrimination actions brought under Ohio law. R.C. 4112.02(A) provides that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.99 authorizes civil actions for any violations of R.C. Chapter 4112. Generally, Ohio

courts look to federal anti-discrimination case law when examining employment discrimination cases pursued under state law. *Nelson v. Univ. of Cincinnati*, 10th Dist. No. 16AP-224, 2017-Ohio-514, ¶ 31, citing *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, ¶ 15. *But see Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 31 (stating Ohio courts are not bound to federal interpretation of analogous statutes).

**{¶ 23}** In order to prevail in an employment discrimination case, a plaintiff must prove discriminatory intent through either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983), fn. 3. " '[D]irect evidence [of discrimination] is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' " *Ray v. Ohio Dept. of Health*, 10th Dist. No. 17AP-526, 2018-Ohio-2163, ¶ 27, quoting *Ceglia v. Youngstown State Univ.*, 10th Dist. No. 14AP-864, 2015-Ohio-2125, ¶ 16 (further citations omitted).

**{¶ 24}** A plaintiff may indirectly establish discriminatory intent using the analysis promulgated in *McDonnel Douglass Corp. v. Green*, 411 U.S. 792 (1973). *See Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 197 (1981). A plaintiff claiming discrimination in employment through indirect evidence must first demonstrate a prima facie case of discrimination. *Bowditch v. Mettler Toledo Internatl., Inc.*, 10th Dist. No. 12AP-776, 2013-Ohio-4206, ¶ 15. If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate non-discriminatory reason for the challenged action. *Id.* at ¶ 16. If the employer meets its burden of production, a plaintiff must prove by a preponderance of the evidence that the employer's legitimate non-discriminatory reason is merely a pretext for unlawful discrimination. *Id.* at ¶ 17.

**{¶ 25}** A plaintiff establishes a prima facie case of discrimination by showing that: (1) he or she was a member of a statutorily protected class, (2) he or she was subjected to an adverse employment action, (3) he or she was qualified for the position, and (4) he or she was replaced by, or that the removal permitted the retention of, a person not belonging

to the protected class. *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 15.

{¶ 26} As a threshold matter, Leach argues the Court of Claims erred in determining OSU satisfied its initial burden in its motion for summary judgment. More specifically, Leach argues OSU's position that he provided no evidence of direct discrimination was not sufficient to satisfy its burden under Civ.R. 56 to affirmatively demonstrate there was no genuine issue of material fact, and, thus, the court should have denied OSU's motion for summary judgment on that basis alone. Through this argument, Leach misconstrues OSU's motion for summary judgment.

{¶ 27} In support of its motion for summary judgment, OSU filed five depositions, two affidavits, and additional documentary exhibits. These evidentiary materials included materials related to OSU's internal investigation of Leach, as well as the deposition testimony of Leach, Chief Spears-McNatt, Lieutenant Shaul, and Simpson. OSU argued to the court that it was Leach's burden to demonstrate discriminatory intent and noted that a review of the evidentiary materials in the record revealed "no direct evidence of discrimination." (Mot. for Summ. Jgmt. at 13.) Thus, OSU did not, as Leach argues, make a blanket statement that Leach could not prove his case. Instead, OSU pointed the court to the Civ.R. 56 evidentiary materials and argued those materials did not contain any direct evidence of discrimination. *See WBL SPE II*, *L.L.C. v. Acme Ents.*, 10th Dist. No. 18AP-597, 2020-Ohio-1394, ¶ 15 (the party moving for summary judgment "bears the initial burden of identifying the portions of the record that demonstrate an absence of material fact"), citing *Dresher* at 293.

{¶ 28} Leach agrees on appeal he sought to prove his discrimination claim only through direct evidence, not through indirect evidence and the *McDonald-Douglas* burden-shifting analysis. We note, however, that Leach's amended complaint indicated his original intent to attempt to prove discrimination through both the direct and indirect methods, identifying in his amended complaint an alleged similarly situated comparable employee. Thus, in its motion for summary judgment, OSU also argued that, relying on the same evidentiary materials, Leach's discrimination claim must additionally fail under the indirect method of proof. Leach asserts OSU's argument about a lack of direct evidence of discrimination was underdeveloped and that the evidence OSU relied upon only speaks

to the indirect method of proving discrimination, an avenue of proof he no longer intended to pursue. We disagree. As explained above, OSU did more than make a blanket statement that Leach could not prove his case. Even though OSU relied on the same evidentiary materials in its analysis of both direct and indirect evidence of discrimination, we find OSU's reliance on the Civ.R. 56 evidentiary materials and its argument that nothing in those materials could be considered direct evidence of discrimination was sufficient to carry its initial burden on summary judgment of demonstrating there exists no genuine issue of material fact.

{¶ 29} Leach next argues the court erred in concluding there was no genuine issue of material fact with respect to whether Leach had direct evidence of discrimination. A plaintiff may establish discrimination with direct evidence that shows the employer, more likely than not, was motivated by discriminatory intent. *Ray* at ¶ 23, citing *Mauzy* at paragraph one of the syllabus. "Direct evidence is ' "proof which speaks directly to the issue, requiring no support by other evidence." ' " *Chapa v. Genpak, L.L.C.*, 10th Dist. No. 12AP-466, 2014-Ohio-897, ¶ 89, quoting *Carter v. Russo Realtors*, 10th Dist. No. 00AP-797 (May 22, 2001), quoting *Randle v. LaSalle Telecommunications, Inc.*, 697 F.Supp. 1474 (N.D.Ill.1988). "Such evidence ' "directly proves a fact without an inference or presumption; and which, if true, conclusively establishes that fact." ' " *Id.*, quoting *Carter*, quoting *Randle* at 1478; *Ray* at ¶ 27 (" '[d]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group' "), quoting *Johnson v. Kroger*, 319 F.3d 858, 865 (6th Cir.2003).

{¶ 30} If a plaintiff can establish direct evidence of discriminatory intent, the burden then shifts to the employer to demonstrate, by a preponderance of the evidence, it would have reached the same decision absent any discrimination. *Chapa* at ¶ 89, citing *Carter*. If the employer cannot so demonstrate, the plaintiff prevails. *Id.*, citing *Carter*. The burden of persuasion to prove discriminatory intent motivated the employer's decision rests with the plaintiff. *Id.*, citing *Carter*.

{¶ 31} Leach argues he pointed to direct evidence of discrimination, relying on Lieutenant Shaul's statement in her deposition that the general public "may have a perception of what an abuser looks like." (Shaul Depo. at 52.) Leach asserts this statement

is direct evidence of discrimination because it provides a "window into the mind" of a key "decision maker" in his termination. *Sharp v. Aker Plant Servs. Group*, 726 F.3d 789, 799 (6th Cir.2013) ("[i]f there was ever a window into the mind of an employment decisionmaker, that was it"). Critically, however, Leach isolates this statement from the larger context of Lieutenant Shaul's deposition testimony. During her deposition, Lieutenant Shaul was questioned whether the public has a perception about perpetrators of domestic violence. The following exchange occurred:

> Q. With respect to the public perception of domestic violence that you mentioned, in your experience, are people more likely to believe that a man or a woman is perpetrating domestic violence?
>
> * * *
>
> THE WITNESS: Well, I mean, public, the, like, general person on the street, I would think they would lean towards male perpetrators, yeah.
>
> * * *
>
> Q: And based on your training and experience in the area, do you think that public perception is fair or unfair?
>
> A. I think it just is. It doesn't really -- you know, I've seen it both ways for sure. I couldn't, like, put percentages on it. I would agree there have been more males. But each situation is so specific and so unique that I think -- one of the things that - - yeah, so people that do this work or work around these, in these situations or have training in this area, it's not -- I don't know how to separate out the training and experience that I have and the understanding I have of this sort of situation compared to somebody on the street. I would not -- I wouldn't compare them. I wouldn't -- apples and oranges. *So I don't consider the public perception of domestic violence.* I understand that it's a lot more complicated than people think. I think it affects all sorts of people. Like, people may, the public may have a perception of what an abuser looks like. *I do not share any such perception. I believe that I have a nuanced, more nuanced, let's say, understanding of the way relationship violence works. And so I don't consider really, other than just noting it, what public perception is of domestic violence abusers.*

(Emphasis added.) (Shaul Depo. at 51-53.)   The full context of the statement indicates Lieutenant Shaul did not consider any potential public perception of domestic violence when she conducted her investigation.   Thus, we do not agree with Leach that this statement provides a window in Leach's mind as a key decision-maker in his termination.

{¶ 32} More fundamentally, we also do not agree with Leach that Lieutenant Shaul's statement about the public perception of "what an abuser looks like" is direct evidence of discriminatory intent.  To consider that statement evidence of discrimination, the factfinder would have to make an inference that the statement represented discriminatory intent.  As we have explained, however, direct evidence, by definition, directly proves a fact *without* inference or reference to other information.  *Chapa* at ¶ 89; *Ray* at ¶ 27.  Thus, we agree with the court that, even construing the evidence most strongly in Leach's favor, the only reasonable conclusion is that Lieutenant Shaul's statements during her deposition regarding the perception of the public and that she did not act on that perception does not constitute direct evidence of discriminatory intent.

{¶ 33} For these reasons, the Court of Claims did not err in granting OSU's motion for summary judgment.  We overrule Leach's first and second assignments of error.

## IV. Third Assignment of Error – Dismissal of Collective Bargaining Agreement Claims

{¶ 34} In his third and final assignment of error, Leach argues the court erred in granting OSU's motion to dismiss the breach of contract claim for lack of subject-matter jurisdiction.

{¶ 35} Civ.R. 12(B)(1) permits the responsive party to seek dismissal where the trial court lacks jurisdiction over the subject matter of the litigation.  *Guillory v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 07AP-861, 2008-Ohio-2299, ¶ 6.   Subject-matter jurisdiction involves a court's power to hear and decide a case on the merits.  *Lowery v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-730, 2015-Ohio-869, ¶ 6.  In deciding a Civ.R. 12(B)(1) motion, a court must dismiss for lack of subject-matter jurisdiction if the complaint fails to allege any cause of action cognizable in the forum.  *Brown v. Levin*, 10th Dist. No. 11AP-349, 2012-Ohio-5768, ¶ 14.   An appellate court reviews a trial court's decision on a Civ.R. 12(B)(1) motion to dismiss for lack of subject-matter jurisdiction under

a de novo standard of review. *Pankey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-701, 2014-Ohio-2907, ¶ 7.

{¶ 36} Leach asserted in his complaint a claim of breach of contract based on a collective bargaining agreement. He argues that because his breach of contract claim is a civil action against the state, the Court of Claims has jurisdiction over the matter pursuant to R.C. 2743.03.

{¶ 37} R.C. 2743.03(A)(1) provides the Court of Claims has exclusive, original jurisdiction over all civil actions against the state, unless otherwise provided by the legislature. *Lemay v. Univ. of Toledo Med. Ctr.*, 10th Dist. No. 17AP-640, 2018-Ohio-1311, ¶ 17. The legislature has also enacted R.C. 4117.09, which governs collective bargaining agreements. R.C. 4117.09 provides:

> (B) The agreement shall contain a provision that:
>
> (1) Provides for a grievance procedure which may culminate with final and binding arbitration of unresolved grievances, and disputed interpretations of agreements, and which is valid and enforceable under its terms when entered into in accordance with this chapter. No publication thereof is required to make it effective. A party to the agreement may bring suits for violation of agreements or the enforcement of an award by an arbitrator in the court of common pleas of any county wherein a party resides or transacts business.

{¶ 38} This court has previously considered the tension between R.C. 2743.03(A)(1) and 4117.09(B)(1). In *Moore v. Youngstown State Univ.*, 63 Ohio App.3d 238 (10th Dist.1989), we held R.C. 4117.09 grants exclusive jurisdiction to the courts of common pleas over actions alleging a violation of a collective bargaining agreement even where the action is brought against the state. *Id.* at 242. This court has repeatedly relied on *Moore* and reiterated its holding that R.C. 4117.09 grants exclusive jurisdiction to the courts of common pleas for actions governing collective bargaining agreements. *See, e.g., Lemay* at ¶ 21 ("R.C. 4117.09 grants exclusive jurisdiction to the courts of common pleas over actions governing a collective bargaining agreement."); *Young v. Ohio State Univ. Hosps.*, 10th Dist. No. 16AP-527, 2017-Ohio-2673, ¶ 13; *Nnazor v. Cent. State Univ.*, 10th Dist. No. 16AP-327, 2016-Ohio-8539, ¶ 21; *Crable v. Ohio Dept. of Youth Servs.*, 10th Dist. No. 09AP-191, 2010-Ohio-788, ¶ 12 ("[t]he Court of Claims lacks jurisdiction over an action

which alleges a violation of a collective bargaining agreement because R.C. 4117.09 grants exclusive jurisdiction over such actions to the courts of common pleas").

{¶ 39} Leach acknowledges the language of R.C. 4117.09 and this court's prior holdings in *Moore* and its progeny, but he argues his claim of breach of the collective bargaining agreement is not within the exclusive jurisdiction of the court of common pleas because the collective bargaining agreement here did not contain a provision that a party may bring suit in the court of common pleas. Since the collective bargaining agreement contains the proper language for the grievance procedure but does not include the additional language required by R.C. 4117.09(B)(1) for bringing suit in the court of common pleas, Leach asserts the Court of Claims erred in determining it did not have subject-matter jurisdiction over the breach of contract claim. He argues the statute instead should be construed as an optional forum selection clause for the parties, not as a jurisdictional bar to the Court of Claims.

{¶ 40} We find Leach's argument unpersuasive. As explained above, this court has already held R.C. 4117.09 dictates which court has subject-matter jurisdiction over an action alleging a violation of a collective bargaining agreement. *Moore* at 242; *Lemay* at ¶ 21. Nothing in the language of R.C. 4117.09 grants the parties the authority to change the jurisdiction of either the courts of common pleas or the Court of Claims by omitting the statutorily required language. Instead, the power to define the subject-matter jurisdiction of these courts rests with the legislature. *Ostanek v. Ostanek*, 166 Ohio St.3d 1, 2021-Ohio-2319, ¶ 36 ("Article IV, Section 4(B) [of the Ohio Constitution] grants the General Assembly the power to define the subject-matter jurisdiction of the common pleas courts"); R.C. 2743.03 (creating and conferring jurisdiction to the Court of Claims). Thus, we decline Leach's invitation to overrule *Moore* and its progeny.

{¶ 41} Leach additionally argues the Supreme Court of Ohio impliedly abrogated *Moore* when it decided *State ex rel. Wilkinson v. Reed*, 99 Ohio St.3d 106, 2003-Ohio-2506. In *Wilkinson*, the Supreme Court noted the Eight District Court of Appeals had held that R.C. 4117.09(B)(1) " 'does not provide a right to an original action in the court of common pleas,' " but " 'requires that any collective bargaining agreement contain a two step procedure -- a grievance procedure with arbitration first, and ultimately the right to file in common pleas court.' " *Wilkinson* at ¶ 19, quoting *Johnson v. Ohio Council Eight*, 146 Ohio

App.3d 348, 352 (8th Dist.2001). Despite acknowledging the Eighth District's decision in *Johnson*, the Supreme Court did not, as Leach suggests, go on to hold that R.C. 4117.09(B)(1) is merely a forum selection clause. Instead, the Supreme Court explained that the issue in *Wilkinson* was whether the common pleas court had jurisdiction over an allegation of an unfair labor practice pursuant to R.C. 4117.11, not an allegation of a violation of a collective bargaining agreement. *Id.* at ¶ 19. Accordingly, we do not agree with Leach that *Wilkinson* impliedly abrogated *Moore* and its progeny.

{¶ 42} Because the Court of Claims did not err in concluding it lacked subject-matter jurisdiction over Leach's breach of contract claim based on the collective bargaining agreement, the Court of Claims properly granted OSU's motion of partial dismissal. Therefore, we overrule Leach's third and final assignment of error.

## V. Disposition

{¶ 43} Based on the foregoing reasons, the Court of Claims did not err in granting OSU's motion for summary judgment on Leach's employment discrimination claim or in granting OSU's motion to dismiss for lack of subject-matter jurisdiction Leach's breach of contract claim based on a collective bargaining agreement. Having overruled Leach's three assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

EDELSTEIN and LELAND, JJ., concur.

_____